**In re CAP ROCK ELECTRIC COOPERATIVE, INC.**

No. 06–00–00143–CV.

Court of Appeals of Texas, Texarkana.

Submitted Dec. 18, 2000.

Decided Dec. 19, 2000.

David M. Stagner, Stagner & Corley, Sherman, for relator.

Robert. E. Richardson, Jr., Richardson Law Firm, Sherman, for Glen Gambill, et al.

D. Bradley Dickinson, Dallas, James R. Rodgers, Paris, for Lamar Electric.

J. Don Gordon, Hynds & Gordon, Sherman, John R. Mercy, Mercy, Carter & Elliott, LLP, Texarkana, for Philip Risinger, et al.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

GRANT, Justice.

Cap Rock Electric Cooperative, Inc., Relator, brings this petition for writ of mandamus against Judge Jim D. Lovett of the Sixth Judicial District Court of Lamar County, Texas. Cap Rock intervened in Cause No. 67862, Lamar County Judicial District Court, *Philip Risinger v. Lamar County Electric Cooperative Association,* and moved the trial court to disqualify the attorney representing the plaintiff, J. Don Gordon. After a hearing, Judge Lovett denied the motion resulting in the filing of Cap Rock's petition in this court.

In both the trial motion and the petition filed in this court, Cap Rock sets forth the factual and procedural background of this dispute:

In the 1980s, Hunt–Collin Electric Cooperative provided power and energy to its customers in Hunt and Collin Counties. During that period, it joined with other rural electric cooperatives to form Rayburn Country Electric Cooperative, Inc. for the purpose of increasing its bargaining position in the negotiation of the purchase of electric power.

Around 1986 Hunt–Collin expressed its disagreement with certain actions carried out by Rayburn, which resulted in litigation between the two. During the various lawsuits that were filed, Hunt–Collin retained the law firm of Munson, Munson, Hynds, Gordon & Pierce to represent its interests. J. Don Gordon of that law firm became lead counsel for Hunt–Collin in the litigation. In November 1998, the Hunt–Collin/Rayburn litigation was settled, and a document entitled "Agreement on Principles" was executed by the parties. Gordon represented Hunt–Collin during these settlement negotiations and executed the settlement document on its behalf.

The petition filed in this court asserts that during Gordon's representation of Hunt–Collin, he was privy to confidential information regarding its business strategies and other affairs of the cooperative.

Cap Rock began negotiations with Hunt–Collin regarding a possible merger. An agreement along these lines was consummated in 1991. Under the "Agreement to Combine, et al" Hunt–Collin was to be legally dissolved and all members of Hunt–Collin automatically became Cap Rock members with their patronage capital vested in the Cap Rock organization.

Around mid–1999, Cap Rock entered into discussions with Lamar Electric Cooperative Association, a defendant in the Lamar County suit, concerning a possible merger with that entity. This agreement was also consummated. The petition avers that an affirmative vote of the Lamar membership was required in order to approve the merger. However, before this could be completed, Rayburn filed suit against Cap Rock in the District Court of Midland County, Texas. In a pleading filed in that case, Rayburn claimed that a 1996 settlement agreement entered into between Cap Rock and Rayburn precluded the attempted merger between Lamar and Cap Rock. As an exhibit filed with a motion for partial summary judgment, Rayburn included a copy of the "Agreement on Principles" executed in connection with the settlement in the Hunt–Collin/Rayburn litigation, and which was executed by Gordon on behalf of Hunt–Collin. Cap Rock asserts in its petition to this court that part of Rayburn's argument against the proposed merger of Cap Rock and Lamar was based on the contents of the "Agreement on Principles" signed by attorney Gordon.

In December 1999, the proposed merger of Lamar and Cap Rock was submitted to a vote of the membership of Lamar. Cap Rock asserts in its petition that on December 14, 1999, the membership of Lamar overwhelmingly approved the proposed merger.

After this vote, a number of dissident members of the Lamar Cooperative challenged the voting procedures used to approve the merger, and these dissident members retained Gordon as their lawyer. Cap Rock asserts that while the dissidents facially challenge the procedure by which the proposed merger was approved by the membership of Lamar, their goal is to stop the merger between Lamar and Cap Rock. On or about June 22, 2000, Philip Risinger, one of the dissident members, filed Cause No. 67862 against Lamar and certain of its directors in Lamar County, with Gordon as his attorney of record. In their response to the petition, the real parties in interest have asserted the following with regard to the legal actions taken by the dissident members of Lamar:

On June 5, 2000, pursuant to the By-laws of LEC [Lamar], the Members [dissident members] filed with Zed Smith, the secretary of the Board of Directors of LEC, a list of charges against LEC Directors Glen Gambill, Richard Weems, and Darrell Coats, along with a petition signed by more than one thousand of the members of LEC requesting the removal from office of Gambill, Weems, and Coats. On September 7, 2000, the Members filed a second petition setting out fourteen (14) specific charges against Directors Gambill, Weems, and Coats, and calling for a meeting of the association on October 28, 2000, to vote on the removal of Gambill, Weems, and Coats. Smith failed to carry out his duties as prescribed by the bylaws of LEC and did not notify Gambill, Weems and Coats of the charges or notify the members of LEC of the date and time of the special meeting of the members of LEC, as required by the bylaws.

Because of actions taken by Lamar in what real parties in interest call an effort "[t]o thwart the Members' efforts to require a meeting of the membership of LEC," suit was brought by the dissident members seeking a declaratory judgment, injunctive relief, and damages for defamation.

The trial court set July 7, 2000, as the date of the hearing on the request for a temporary injunction. The hearing was continued until July 18, 2000, and again

continued until August 4, 2000. On August 4, Cap Rock intervened in the lawsuit and filed a motion to disqualify Gordon. A hearing was begun on the motion to disqualify and the request for temporary injunction, and was again continued to September 15, 2000. At the hearing on September 15, evidence was taken on the motion to disqualify. At the hearing, Gordon, Jack Nelson (a plaintiff) and Ronnie Lyon, general counsel for Cap Rock, testified and documentary evidence was introduced. Judge Lovett, during the September 15 hearing, orally advised that he was going to deny the motion to disqualify. The trial court's written order was signed October 5, 2000.

 The real parties in interest contend that certain defects in Cap Rock's submission to this court in support of its petition are sufficient to preclude the mandamus jurisdiction of this court without even reaching the merits of the dispute. They cite Tex.R.App.P. 52.7(a)(2), which requires, *inter alia,* that a relator file with its petition, "a properly authenticated transcript of any relevant testimony from any underlying proceeding, including any exhibits offered in evidence, or a statement that no testimony was adduced in connection with the matter complained." They contend that there were petitions and a list of charges filed with the secretary of the Board of Directors of Lamar on June 5 and September 7, 2000, and that there were hearings held by the trial court before the September 15 hearing, specifically, hearings held July 7, July 18, and August 4, 2000, the August 4 date being the date on which Cap Rock intervened in the underlying litigation, which were not included in the record. The real parties in interest assert in their response that "Cap Rock has attempted to limit this Court's review of the record and then argues that it only had a summary proceeding." In support of their argument, they cite a recent pronouncement of the Texas Supreme Court, which stated that mandamus relief, controlled largely by equitable principles, may be denied a party for lack of diligence. *In re Users Sys. Serv., Inc.,* 22 S.W.3d 331, 337 (Tex.1999). Further, it is clear that a court of appeals may not grant mandamus relief when the petition and record require the court to speculate. *In re Colony Ins.,* 978 S.W.2d 746, 747 (Tex. App.—Dallas 1998, orig. proceeding); *Frink v. Blackstock,* 813 S.W.2d 602, 604 (Tex.App.—Houston [1st Dist.] 1991, orig. proceeding). In both of these cases, mandamus relief was denied because the petition and record furnished this court were not sufficient to accurately determine whether mandamus would lie.

Our review of the mandamus record does not indicate a fatal lack of diligence on the part of the relator Cap Rock, or does it require speculation on the part of the court. Cap Rock has included in the extensive record, filed with its petition, *inter alia,* the entire reporter's record of the September 15, 2000, hearing before Judge Lovett at which the judge denied Cap Rock's motion to disqualify Gordon. The witnesses testifying at this hearing included Gordon, one of his clients in the underlying litigation, and the general counsel for Cap Rock, all of the parties with an interest in whether Gordon was to be disqualified. Cap Rock has also furnished documents from this underlying litigation and from past litigation, and other documentation in support of its petition. Based on the issues raised in the petition, *infra,* we find that there is sufficient evidence in the record for the court to rule on the Petition for Writ of Mandamus.

 The real parties in interest have also raised, under the general argument of lack of diligence on the part of Cap Rock, the timing of the filing of the Petition for Writ of Mandamus. They assert that while the adverse ruling of Judge Lovett was orally pronounced at the September 15 hearing,[1] Cap Rock waited until October 19, 2000, to file its petition. Real

---

1. The written order denying relief was signed October 5, 2000.

parties in interest assert that this was done because ten days' notice was required to be given to members regarding a membership meeting which they sought to hold on October 28, and that the timing of mandamus was delayed so as to preclude giving notice required under the bylaws of the cooperative.

In *B.F. Goodrich Co. v. McCorkle*, 865 S.W.2d 618, 621 (Tex.App.—Houston [14th Dist.] 1993, orig. proceeding), the Fourteenth Court of Appeals found that a delay of a month and two days from the trial court's ruling until the filing for mandamus relief did not waive the relator's right to mandamus.

In the present case, Cap Rock waited a little over thirty days from the date of the hearing, but only two weeks from the date of the signing of the order by Judge Lovett, to petition this court for mandamus relief. Regardless of the tactical motivation, even if conceded to be correct, we likewise cannot find this delay enough to constitute waiver on Cap Rock's part.

Mandamus relief is available to correct a clear abuse of discretion for which there is no adequate remedy at law. Because appeal after final judgment would be inadequate, mandamus relief is available to correct a trial court's failure to order disqualification of counsel, based on counsel's previous representation of an adverse party. *In re Epic Holdings, Inc.*, 985 S.W.2d 41, 54 (Tex.1998).

Cap Rock, in order to establish a basis for disqualification of Gordon as counsel for plaintiffs in Cause No. 76862, the *Risinger* case, must demonstrate that it has a continuing right, as a former client, under the attorney-client privilege, which is entitled to protection and that the *Risinger* action and the action in which Gordon formerly represented it, allegedly standing in the shoes of Hunt–Collin, are "substantially related."

▮ In order to have standing to disqualify Gordon, Cap Rock has the burden of establishing, first that, through Gor-

don's representation of Hunt–Collin in its dispute with Rayburn in 1988, a former attorney-client relationship existed as to Cap Rock. In the case of the acquisition of one corporate entity by another after the attorney's representation, whether a former attorney-client relationship exists will depend on whether the acquisition is considered a merger or if the acquisition was by purchase and sale of all or substantially all of the acquired corporation's assets.

▮ The attorney-client privilege extends to corporate entities as well as to individuals. When a corporation passes to new management, the authority to assert the privilege passes as well. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348, 105 S.Ct. 1986, 85 L.Ed.2d 372, 378 (1985); *see also United States v. Nabisco, Inc.*, 117 F.R.D. 40, 43–44 (E.D.N.Y.1987); *Oswall v. Tekni–Plex, Inc.*, 299 N.J.Super. 658, 691 A.2d 889, 894 (1997); *Tekni–Plex v. Meyner & Landis*, 89 N.Y.2d 123, 651 N.Y.S.2d 954, 674 N.E.2d 663, 668 (1996); *Thomson U.S., Inc. v. Gosnell*, 151 Misc.2d 249, 573 N.Y.S.2d 375, 381 (1991), *aff'd*, 181 A.D.2d 558, 581 N.Y.S.2d 764 (N.Y.App.Div.1992).

> *Weintraub* establishes that, where efforts are made to run the pre-existing business entity and manage its affairs, successor management stands in the shoes of prior management and controls the attorney-client privilege with respect to matters concerning the company's operations. It follows that, under such circumstances, the prior attorney-client relationship continues with the newly formed entity.
>
> By contrast, the mere transfer of assets with no attempt to continue the pre-existing operation generally does not transfer the attorney-client relationship.

*Tekni–Plex*, 651 N.Y.S.2d 954, 674 N.E.2d at 668.

▮ When a merger of two corporations takes effect, all rights, title, and interest to all property owned by each enti-

ty that is a party to the merger is vested in the surviving or new corporation, "without further act or deed, and without transfer or assignment having occurred...." TEX.BUS.CORP.ACT ANN. art. 5.06(A)(2) (Vernon Supp.2001). In the 1996 Comment of the Bar Committee to Article 5.06, it is stated that Article 5.06 was amended in 1987 "to make clear that while a merger vests the rights, *privileges,* immunities and franchises of the merged corporation in the surviving corporation, this is accomplished without a transfer or assignment having occurred." TEX.BUS.CORP.ACT ANN. art. 5.06 cmt. (Vernon Supp.2001) (emphasis added). Our Supreme Court has stated, "In a merger, the *privileges,* powers, rights, and duties of the corporation are transferred to the surviving corporation and are there continued and preserved." *Bailey v. Vanscot Concrete Co.,* 894 S.W.2d 757, 759 (Tex.1995) (emphasis added).

On the other hand, where a corporate transaction is considered solely as a disposition of all or substantially all of the acquired corporation's property and assets, it is not considered a merger, and the acquiring corporation is not responsible or liable for any obligations of the selling corporation that it did not expressly assume. TEX. BUS.CORP.ACT ANN. art. 5.10(B)(1), (2) (Vernon Supp.2001). This portion of the Business Corporation Act specifically provides that the purchase of all or substantially all of a seller's assets does not make the buyer liable for the obligations of the seller. *See Mexican Nat'l Constr. Co. v. Middlegge,* 75 Tex. 634, 13 S.W. 257, 258 (1890); *Mudgett v. Paxson Mach. Co.,* 709 S.W.2d 755, 758 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.); *Griggs v. Capitol Mach. Works, Inc.,* 690 S.W.2d 287, 293 (Tex.App.—Austin), *writ ref'd,* 701 S.W.2d 238 (Tex.1985); *see* James Ryan & Robert Beasley, *Asset Acquisitions: Caveat Emptor,* 53 TEX.B.J. 1222 (1990).

Examining the 1991 agreement between Hunt–Collin and Cap Rock, in addition to the provisions already referred to above, we consider the following:

(1) The agreement is entitled "AN AGREEMENT TO *COMBINE* HUNT–COLLIN AND CAP ROCK ELECTRIC COOPERATIVES," (emphasis added), and is not entitled "An Agreement for the Purchase and Sale of Assets."

(2) The agreement contains language calling the actions accomplished therein a "combination."

(3) In paragraph 2.1, the agreement specifically provides that Hunt–Collin will transfer, convey, assign, and deliver all Hunt–Collin properties, etc., including, specifically, all *privileges,* to Cap Rock.

(4) In paragraph 3.1, the agreement provides that at the time of the transfer in section 2.1, "all of Hunt–Collin's then-existing members shall automatically become Cap Rock members with their patronage capital vested in the Cap Rock organization." [2]

(5) Paragraph 8.6 specifically uses the words "merger" and "consolidate," as well as the phrase "transfers substantially all of its assets." This certainly indicates that the parties to the agreement understood the difference between the two types of transactions. If they meant for the agreement to be one solely for the purchase and sale of assets, they would have called it that.

(6) In paragraph 2.4, the agreement provides that for a forty-eight month period, the Hunt–Collin entity would be maintained as a division of Cap Rock.

Based on the language of the agreement, we conclude that the parties merged. A merger with regard to corporations is defined as "[t]he absorption of one company (esp. a corporation) that ceases to exist into another that retains its

---

**2.** "Membership" is the unit of ownership of electric cooperatives. TEX.UTIL.CODE ANN.

§§ 161.054(a)(7),161.065,161.066 (Vernon 1998).

own name and identity and acquires the assets and liabilities of the former." BLACK'S LAW DICTIONARY 1002 (7th ed.1999). According to paragraph 3.1, the owners of all existing memberships became owners of Cap Rock. This is indicative of a merger.

However, even though this agreement is properly characterized as a merger, events subsequent to the actual agreement itself bear on the issue of whether there is a continuing attorney-client relationship between Hunt–Collin and Gordon that still merits protection. It should be noted that plaintiff's exhibit 10, introduced and admitted into evidence at the September 15 hearing, is a 1997 assignment by Hunt–Collin to Cap Rock of every conceivable kind of property and every kind of debt and liability it might own. At the hearing, Ronnie Lyon, the general counsel of Cap Rock, was questioned regarding this document:

Q. It's your testimony that there was nothing left of Hunt–Collin, asset-wise, rights-wise, claims-wise, at the time Plaintiff's No. 10 was executed?

A. That's my opinion, yes.

Plaintiff's exhibit 9, also admitted into evidence by the trial court, is a copy of an order of the Public Utilities Commission, dated September 28, 1992, which approved the merger between Hunt–Collin and Cap Rock. Among the provisions of the order are the cancellation of Hunt–Collin's Certificate of Convenience and Necessity, its charter to function as an electric cooperative, and the amendment of Cap Rock's Certificate of Convenience and Necessity to include the area currently served by Cap Rock.[3]

This particular situation we find to be comparable to cases wherein an entity functioning as a liquidator, such as the FDIC, seeks to assert the attorney-client privilege on behalf of the liquidated business, to disqualify an attorney. In *Fed. Deposit Ins. Corp. v. Amundson*, 682 F.Supp. 981 (D.Minn.1988), the FDIC sought to disqualify an attorney who formerly represented a liquidated bank from representing one of its former directors in the FDIC's suit against him. The FDIC relied on *Weintraub, supra,* but that analogy was rejected by the court. It noted that *Weintraub* involved a bankrupt corporation, and the bankruptcy trustee was attempting to maintain the operation of the corporate entity. In this case, the bank was dead; no attempt was being made to maintain its operation as an ongoing entity. The court's opinion states, "Here, the potential conflict of interest assertion is of no value to the FDIC—save and except as a sword to drive into its opponent. The bank is dead. There is no existing—or potential—corporation. That entity is gone and it will not, and cannot, be reconstituted. The FDIC's assertion is a pure substitution of claimed form for function." *Id.* at 987; *see also Bagdan v. Beck,* 140 F.R.D. 660, 667 (D.N.J.1991).

Since the time Gordon represented Hunt–Collin, it has been dissolved as a corporation, and its ability to function as a legally authorized provider of electric service to its customers has been revoked. All of its assets and liabilities have been assigned to Cap Rock. There is no longer an effort being made to run Hunt–Collin as an existing business. It is in the same operating condition as the liquidated bank in the *Amundson* case cited above. Since Hunt–Collin is, for all legal purposes, dead, there is no continuing attorney-client relationship deserving of protection in this instance, particularly in light of our discussion of the substantially related standard, *infra.*

Rule 1.09, Texas Disciplinary Rules of Professional Conduct, provides, in part, as follows:

(a) Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereaf-

---

**3.** Plaintiff's exhibit 8, included in the record, but whose admission was denied by the trial court, was a certificate of the corporate dissolution of Hunt–Collin dated July 7, 1997.

ter represent another person in a matter adverse to the former client:

....

(2) if the representation in reasonable probability will involve a violation of Rule 1.05; or

(3) if it is the same or a *substantially related matter.*

TEX.DISCIPLINARY R. PROF'L CONDUCT 1.09 (emphasis added).[4]

▓▓▓ The disciplinary rules are not determinative of whether counsel should be disqualified in litigation; however, they do provide guidelines and suggest the relevant considerations. *In re Epic Holdings, Inc.*, 985 S.W.2d 41, 48 (Tex.1998); *Henderson v. Floyd*, 891 S.W.2d 252, 253 (Tex.1995). The "substantial relationship" test as applied by the courts in similar cases does not originate in the disciplinary rules, but in the common law. *In re Am. Airlines, Inc.*, 972 F.2d 605, 617 (5th Cir. 1992). In the *American Airlines* opinion, the Fifth Circuit cited *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F.Supp. 265 (S.D.N.Y.1953), as the leading case articulating the applicable standard, predating the disciplinary rules. That case involved a motion by one of the movie company defendants to disqualify its former attorney from representing plaintiffs in an anti-trust suit. In the course of sustaining the motion, Judge Weinfeld articulated the substantial relationship standard:

[T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him....

*Id.* at 268. The rationale for the rule has been articulated by our Supreme Court:

In this manner, the movant is not forced to reveal the very confidences he wishes to protect. By proving the substantial relationship between the two representations, the moving party establishes as a matter of law that an appearance of impropriety exists. Although the former attorney will not be presumed to have revealed the confidences to his present client, the trial court should perform its role in the internal regulation of the legal profession and disqualify counsel from further representation in the pending litigation.

*NCNB Texas Nat'l Bank v. Coker*, 765 S.W.2d 398, 400 (Tex.1989). Disciplinary Rule 1.09(a)(3) establishes a simple prohibition that without the former client's consent, a lawyer should not represent another party in a matter adverse to the former client if the lawyer represented the former client in the same matter or a substantially related matter. *Centerline Indus., Inc. v. Knize*, 894 S.W.2d 874, 876 (Tex.App.— Waco 1995, orig. proceeding).

▓▓▓ Because the remedy of disqualification is severe in the sense that it deprives one of the parties to litigation of the selection of the counsel of its choice, the movant for disqualification is required to establish a preponderance of the facts indicating a substantial relationship between the two representations. The moving party must prove the existence of a prior attorney-client relationship in which the factual matters were so related to the facts in the pending litigation that it creates a genuine threat that confidences that were revealed to the former attorney will be revealed by that attorney to its present adversary. *Coker*, 765 S.W.2d at 400. The movant has the burden of producing evidence of such specific similarities capable of being recited in the disqualification order. *Id.* at 400; *see also Troutman v. Ramsay*, 960 S.W.2d 176, 178 (Tex.App.— Austin 1997, orig. proceeding). As stated by the Fifth Circuit in *American Airlines:*

---

4. TEX.DISCIPLINARY R. PROF'L CONDUCT 1.05(b)(3) provides that, with exceptions, a lawyer shall not knowingly use confidential information of the former client after the representation is concluded unless the former client consents after consultation or the confidential information has become generally known.

[A] substantial relationship may be found only after "the moving party delineates with specificity the subject matter, issues and causes of action" common to prior and current representations and the court engages in a "painstaking analysis of the facts and precise application of precedent."

972 F.2d at 614.

■ The standard of appellate review in Texas state courts has been held to be whether the trial court abused its discretion in disqualifying or refusing to disqualify a party's counsel. *Henderson*, 891 S.W.2d at 253.[5]

■ The record does not demonstrate that Gordon was involved as counsel in any fashion in the 1991 merger agreement between Hunt–Collin and Cap Rock. The record does not indicate that Gordon was involved in the 1996 settlement agreement between Cap Rock, Hunt–Collin, and Rayburn. Although Hunt–Collin was listed as a party to that agreement, the signature page shows that the person who signed for Hunt–Collin also signed for Cap Rock. Gordon was not shown as being involved in any way. Paragraph 2 of the 1996 agreement states among its purposes to "supersede, replace and nullify the Agreement on Principles" which had previously been entered into between Hunt–Collin and Rayburn. In Paragraph 5 of the agreement, both Hunt–Collin and Cap Rock relinquished forever all rights regarding Rayburn, including any rights created by the "Agreement on Principles," the document that had been signed by Gordon on behalf of Hunt–Collin.

The *Risinger* lawsuit does not involve Hunt–Collin; it does not involve any service rendered or performed by Hunt–Collin. It does not concern any continuing liability of Cap Rock for acts of or services performed by Hunt–Collin before the

merger. A copy of the old "Agreement on Principles" is attached to the motion in the Midland litigation between Cap Rock and Rayburn, but it is clear that the 1996 agreement purports to repudiate any continuing reliance by Cap Rock on that document. There is no evidence that while representing Hunt–Collin Gordon had in any manner been involved with Lamar. There is no evidence that Gordon was privy to confidential corporate information regarding Cap Rock, separate and apart from the Hunt–Collin entity. Certainly, Gordon had acquired knowledge regarding Rayburn and had acquired knowledge of this area of practice generally, but this is not confidential knowledge about Cap Rock. Rayburn was the adversary in Gordon's case on behalf of Hunt–Collin.

Further, if *Risinger* was involved in some matter related to the past operation of Hunt–Collin for which Cap Rock was still responsible, the argument of Cap Rock may have some validity. However, *Risinger* does not concern Cap Rock "standing in the shoes" of Hunt–Collin. Hunt–Collin is not seeking to merge with Lamar; Gordon has never represented Cap Rock, *per se*. Neither the Petition for Writ of Mandamus nor the record demonstrates how any confidential information imparted to Gordon by his client Hunt–Collin in 1988 could be detrimental to Cap Rock's interests in the *Risinger* litigation in the year 2000. We cannot from the record in this case find sufficient basis for disqualification of counsel. *See Coker*, 765 S.W.2d at 400. We find the trial court did not abuse its discretion in refusing to disqualify counsel.

The Petition for Writ of Mandamus is denied.

5. The Fifth Circuit, in *American Airlines*, employed a different standard of appellate review: "In this circuit, however, a district court's ruling upon a disqualification motion is not a matter of discretion. Rather, the appellate court review[s] findings of fact for clear error while carefully examining the district court's application of relevant ethical standards." *In re Am. Airlines*, 972 F.2d at 609 (internal quotations omitted).