In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00217-CR


______________________________




MARQUIS RICHARDSON, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the Sixth Judicial District Court


Lamar County, Texas


Trial Court No. 21063




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION


 Marquis Richardson appeals from his conviction for possession of marihuana, between four
ounces and five pounds. After the trial court denied his pretrial hearing on a motion to suppress the
evidence based on a claim that the search was improper, Richardson pled guilty. He was sentenced
to twenty months' confinement.

 Richardson contends the trial court erred by finding the search that resulted in discovery of
the contraband was lawful because police made an unlawful warrantless entry into the apartment. 
He argues that he had standing to contest the search because he was an overnight guest in the
apartment, and he also contends that there were no exigent circumstances to justify a warrantless
search. (1) In the search, officers found a quantity of cocaine, a quantity of marihuana, a pistol and
ammunition, a police band radio scanner (and a code sheet), plastic bags, the lease agreement and
rent receipt, and a total of just under $2,000.00 in cash. 

 We first address standing. If he has no standing, Richardson cannot contest the search. 
Standing is an individual's right to complain about an allegedly illegal governmental search and thus
exclude evidence. Richardson v. State, 865 S.W.2d 944 (Tex. Crim. App. 1992). A party may
challenge a search and seizure where he or she proves "an actual subjective expectation of privacy"
that "society is prepared to recognize as objectively reasonable." Dominguez v. State, 125 S.W.3d
755, 762 (Tex. App.--Houston [1st Dist.] 2003, pet. ref'd); see Villarreal v. State, 935 S.W.2d 134,
138 (Tex. Crim. App. 1996); Holden v. State, 205 S.W.3d 587, 589 (Tex. App.--Waco 2006, no
pet.).

 An accused has standing to contest a search under the Fourth Amendment only if he or she
has a legitimate and reasonable expectation of privacy in the place searched. Rakas v. Illinois, 439
U.S. 128, 144 (1978); Granados v. State, 85 S.W.3d 217, 222-23 (Tex. Crim. App. 2002). A
defendant seeking to suppress evidence always has the burden of proving standing to complain of
the search. Handy v. State, 189 S.W.3d 296 (Tex. Crim. App. 2006). A defendant who bears the
burden of demonstrating a legitimate expectation of privacy can do so by establishing he or she had
a subjective expectation of privacy in the place invaded that society is prepared to recognize as
reasonable. To carry this burden, the accused must normally prove: (a) that by his or her conduct,
the accused exhibited an actual subjective expectation of privacy, i.e., a genuine intention to preserve
something as private; and (b) that circumstances existed under which society was prepared to
recognize the accused's subjective expectation as objectively reasonable. Smith v. Maryland, 442
U.S. 735, 740 (1979); Villarreal, 935 S.W.2d at 138; Richardson, 865 S.W.2d at 948-49. 

 In determining whether that requirement has been met, courts often look at several factors
that have been held relevant to determining whether a given claim of privacy is objectively
reasonable (if the defendant has standing):

 (1) whether the accused had a property or possessory interest in the place invaded; 


 (2) whether the accused was legitimately in the place invaded; 


 (3) whether the accused had complete dominion or control and the right to exclude
others; 


 (4) whether, before the intrusion, the accused took normal precautions customarily taken
by those seeking privacy; 


 (5) whether the accused put the place to some private use; and 


 (6) whether the accused's claim of privacy is consistent with historical notions of
privacy. 

This list of factors is not exhaustive, and none is dispositive of a particular assertion of privacy; 
rather, we examine the circumstances surrounding the search in their totality. See Villarreal, 935
S.W.2d at 138.

 For example, the United States Supreme Court in Minnesota v. Olson, 495 U.S. 91, 98
(1990), recognized that an overnight guest has a legitimate expectation of privacy in his or her host's
home. 

 Similarly, the Court recognized that a registered guest at a hotel has a reasonable expectation
of privacy in the room that he or she has rented and, consequently, is entitled to constitutional
protection against unreasonable searches and seizures there. See Stoner v. California, 376 U.S. 483,
490 (1964). The First Court of Appeals concluded in Wilson v. State, based on those cases, that an
overnight guest of a registered hotel guest shares the registered guest's reasonable expectation of
privacy in the room. 98 S.W.3d 265, 268-70 (Tex. App.--Houston [1st Dist.] 2002, pet. ref'd).

 Although we defer to the trial court's factual findings and view them in the light most
favorable to the prevailing party, we review de novo the legal issue of standing. Kothe v. State, 152
S.W.3d 54, 59 (Tex. Crim. App. 2004); Tucker v. State, 183 S.W.3d 501, 507 (Tex. App.--Fort
Worth 2005, no pet.).

 In this case, the evidence consists of the testimony of the arresting officer and of Richardson. 
Richardson testified he lived in Dallas and had caught a ride with "Stanky" to Paris to visit the
mother of his child. (2) He testified he was planning to stay overnight at the apartment before going
to visit her the next day. Richardson had no ownership or possessory interest in the apartment and
testified that he did not know the person whose apartment it was, but that "Stanky" knew
"Tony"--who he thought was the lessee, and that he thought "Stanky" had permission for them to
stay there. So far as furnishings were concerned, Richardson testified that there was a couch in the
apartment. He also testified that he had been there perhaps three or four hours before the officer
arrived. (3) Richardson also testified that he had brought a bag of clothes with him and that police did
not take them, but that his girlfriend could not find them when she went to the apartment the next
day.

 Officer William Brown testified it was clear no one was living in the apartment. He testified
there was only a couch, a television, a piece of furniture on which the television was sitting, and a
PlayStation game, and there were no beds, and nothing else in the house except for the trash can. 
He testified that both Richardson and "Stanky" told him they did not live there. He also testified that
there were no clothes in the closet and that he saw no other clothing except for a pair of jeans lying
on the couch.

 The officer testified he had sought consent to search from Richardson; Richardson testified
he told the officer it was not his house and he had nothing to do with it. 

 Applying the factors set out above, it is apparent Richardson had no property or possessory
interest in the apartment. The evidence indicates (at most) he may have been legitimately in the
place invaded. Richardson admitted he had "no authority" regarding the apartment. He did not have
a key to the apartment and did not know if his friend "Stanky" (Mann) did. There was no showing
that Richardson had complete control of the apartment or the right to exclude others. It is apparent
precautions had been taken to ensure privacy by pulling blinds and shutting the door--there is no
evidence that Richardson either personally did this or that "Stanky" did it at his bidding. Richardson
testified he planned to stay overnight at the location, and it is not unheard of for a person to sleep on
the floor or on a couch, so the lack of a bed or bedding is not necessarily dispositive. We do
recognize that staying in an enclosed and secured living space (regardless of its level of furnishing)
is traditionally the concept underlying privacy in a residence.

 The State argues alternatively that Richardson came to Paris to sell drugs, as reflected by the
condition of the room itself and its contents, and that it was more of a business location than a
residence in any event.

 Richardson's position has a number of weaknesses. It is true he was in an apartment. It was
not his, and he did not know to whom it belonged, or even if his "friend" had any right to be there,
or if a key was used to get into the apartment, or if the door was open when they arrived. Thus, he
was not given permission to stay there overnight. There is no evidence he did any of the things that
would indicate he had control over the property, and he even denied such when questioned by the
officer. 

 Although ownership is not required to establish a reasonable expectation of privacy, more
than mere entry into the property and a nearly entirely unsupported belief that the person may be
permitted to remain there is required. Further, there is no indication Richardson had any reason to
believe that other individuals, from the actual owner or lessee to a complete stranger, might not come
into the property. He had no right to exclude others. In this instance, there is no evidence to support
an expectation either of actual privacy, or some form of alternative privacy rooted in the expectation
of actual privacy that a third party might have. See Rovnak v. State, 990 S.W.2d 863, 871 (Tex.
App.--Texarkana 1999, pet. ref'd) (The subjective expectation branch was one that society would
recognize as objectively reasonable under the circumstances. However, the claim of privacy was not
consistent with historical notions of privacy because there was no showing that Rovnak had a
property or possessory interest in the vehicle. The driver of the rental car was not authorized to give
Rovnak permission to use it, there was no showing Rovnak was legitimately in the place invaded,
nor did Rovnak have the right to exclude others because the rental agency could have prevented him
from using the vehicle.); see also Pruneda v. State, 104 S.W.3d 302, 306 (Tex. App.--Texarkana
2003, pet. ref'd).

 Having found that Richardson had no standing to contest the search, we affirm the judgment
of the trial court.


 Jack Carter

 Justice


Date Submitted: March 21, 2007

Date Decided: April 18, 2007


Do Not Publish 


1. We note that the State's argument also focuses on whether there was probable cause to arrest
Richardson. That is not the issue raised in this appeal.
2. According to Richardson, he did not even know that "Stanky's" real name is Keith Mann. 
3. Copies of the rental agreement and rent receipt were introduced into evidence--both
indicating Phillip Fields was the lessee and payor.


her trail of blood back;
there was a sufficient amount of blood in the bed of the pickup truck that it was noticed by a deputy
sheriff who saw Cooks at the convenience store in the early morning hours, when it was not fully
daylight. 

 Cooks raised the issue of venue at the trial court level. Therefore, the presumption permitted
in Rule 44.2(c)(1) of the Texas Rules of Appellate Procedure that venue was established does not
apply. See Tex. R. App. P. 44.2(c)(1). On the other hand, "If a person receives an injury in one
county and dies in another by reason of such injury, the offender may be prosecuted in the county
where the injury was received or where the death occurred, or in the county where the dead body is
found." Tex. Code Crim. Proc. Ann. art. 13.07 (Vernon 2005). In this case, it appears that no one
but the perpetrator and the victim witnessed the actual killing itself; no physicians were present when
Millis died so they could testify regarding the issue of precisely when and where he breathed his last. 
The actual site where Millis died had to be established by circumstantial evidence. 

 It has long been held that "[v]enue . . . may be proved by circumstantial as well as direct
evidence. It is sufficient, if from the evidence, the jury may reasonably conclude that the offense was
committed in the county alleged." Curtis v. State, 167 Tex. Crim. 536, 321 S.W.2d 587, 589 (1959). 
Even the more basic question of jurisdiction can be established by circumstantial evidence. Vaughn
v. State, 607 S.W.2d 914, 920 (Tex. Crim. App. [Panel Op.] 1980); Torres v. State, 141 S.W.3d 645,
652 (Tex. App.--El Paso 2004, pet. ref'd).

 Viewing the evidence at trial in the light most favorable to an affirmative venue finding, the
jury could rationally have considered the volume of blood found at Millis's mobile home in Gregg
County and, in doing so, it could reasonably find by a preponderance of the evidence that Millis
received his fatal injuries in Gregg County. In doing so, it could have rationally and reasonably
determined from the evidence before it that the fatal wounds were administered in Gregg County,
establishing venue there. 

 We overrule this point of error.

DISQUALIFICATION OF PROSECUTOR?

 In a motion for new trial and before this Court, Cooks has complained that William Jennings,
the lead prosecuting attorney, had represented Cooks about ten years previously in a burglary and
arson case, the conviction in that case being presented as evidence in the case at bar. Cooks alleges
that Jennings's previous representation of Cooks disqualified Jennings from acting on behalf of the
State. Although Cooks urges two points of error concerning this issue (one being that the alleged
conflict of interest impaired Cooks's ability to receive a fair trial and the other that the trial court
erred in failing to grant a motion for new trial based on that allegation), these two points are
addressed together.

 In almost all circumstances, it is the duty of the district attorneys in Texas to represent the
State in murder cases "except in cases where he has been, before his election, employed adversely." (2)

 All Texas prosecutors are attorneys, subject to the Texas Disciplinary Rules of Professional
Conduct and Texas courts have often looked to those rules for guidance in conflict of interest issues.
In re EPIC Holdings, Inc., 985 S.W.2d 41, 48 (Tex. 1998); In re Meador, 968 S.W.2d 346, 351
(Tex. 1998) (orig. proceeding); see also Anderson Producing, Inc. v. Koch Oil Co., 929 S.W.2d 416,
421 (Tex. 1996); Gonzalez v. State, 117 S.W.3d 831, 837-38 (Tex. Crim. App. 2003) (using Tex.
Disciplinary R. Prof'l Conduct 3.08 as guideline); House v. State, 947 S.W.2d 251, 252-53
(Tex. Crim. App. 1997) (citing Rule 3.08, cmt. 10, which states: "this rule may furnish some
guidance"); In re Works, 118 S.W.3d 906, 909 (Tex. App.--Texarkana 2003, orig. proceeding); In re
Bahn, 13 S.W.3d 865, 872 (Tex. App.--Fort Worth 2000, orig. proceeding).

 Rule 1.09 of the Texas Disciplinary Rules of Professional Conduct concerns conflicts of
interest. It generally prohibits a lawyer from assuming representation of a client adversely to the
interests of a former client "if it is the same or a substantially related matter." (3) A prosecutor should
be disqualified when the matter being prosecuted is the same matter for which that attorney
previously represented the accused. Ex parte Morgan, 616 S.W.2d 625, 626 (Tex. Crim. App.
1981). Extending further, where a subsequent matter is "substantially related," the attorney may also
be prohibited from representing a party adverse to the former client. See EPIC Holdings, Inc., 985
S.W.2d at 51; see also Metro. Life Ins. Co. v. Syntek Fin. Corp., 881 S.W.2d 319, 320 (Tex. 1994).
This "substantial relationship" test is a product of common law and predates the Texas Disciplinary
Rules of Professional Conduct for attorneys. In re Cap Rock Elec. Co-op., Inc., 35 S.W.3d 222, 230
(Tex. App.--Texarkana 2000, orig. proceeding). 

 The reasoning behind this prohibition of first representing a person charged with a crime and
then, upon becoming the prosecutor, representing the State is clear: 

 there exists the very real danger that the district attorney would be prosecuting the
defendant on the basis of facts acquired by him [or her] during the existence of his
[or her] former professional relationship with the defendant. Use of such confidential
knowledge would be a violation of the attorney-client relationship and would be
clearly prejudicial to the defendant.


Morgan, 616 S.W.2d at 626.

 A cogent distinction between this case and others mentioned above is that this case was not
the same as the previous case, which was tried some ten years previous. Its only connection with
this case is that the conviction in the older case could have played a part in the punishment meted
out to Cooks. However, the previous conviction was public record, the fact of which was available
to any prosecutor; the knowledge of its existence was not unique to this prosecutor.

 In his argument at the hearing on his amended motion for new trial, Cooks cited a decision
by this Court (4) as authority for the proposition that an attorney who represents a criminal defendant
and then becomes the district attorney is disqualified from representing the State against that
individual in the future. There are several problems with that position. The first problem is that this
is a misstatement of the ruling of this Court in that case. Specifically, this Court unequivocally
stated that the ruling in that case

 should not be read as an endorsement of the idea that a district or county attorney is
forever barred from prosecuting his or her former clients. That is not the law, nor
should it be. Instead, a disqualification should occur only when (1) the underlying
proceeding is so substantially related to real and actual disclosures (as opposed to
theoretical discussions) that occurred during the previous attorney-client relationship,
and (2) there exists a genuine threat that disclosure of these confidential
communications will either materially advance the State's case or drastically
undermine the accused's ability to mount a defense--such that this advancement or
undermining rises to the level of a due-process violation. We believe such is the case
here, but only because of the discrete facts in the record before us.


Goodman, 210 S.W.3d at 815-16.

 Second, in the Goodman case, the defendant presented affidavits in support of his position
that the prosecutor should be disqualified in Goodman's driving while intoxicated (DWI) case which
related (a) that the prosecutor, Young, had represented Goodman in a previous DWI case, (b) that
Goodman had confidentially discussed his drinking habits at length with Young, and (c) that
Goodman's drinking habits were an integral part of the prosecution of his current case. Contrarily,
there has been no showing here of any evidence that there was any information communicated to
Jennings in the decade-old previous case which could compromise Cooks's defense or which could
have been employed by the State in prosecuting its case against Cooks; any disadvantage to Cooks
or any edge to the State which might have arisen due to the former attorney-client relationship
between Cooks and Jennings remains totally speculative. In short, Cooks has shown no violation
of his due-process rights occurred because of the subsequent representation of the State by Jennings. 

 Despite the fact that the Goodman case (which was a case on a petition for writ of
mandamus) was subsequently set aside because the higher court found that the issue of prosecutor
disqualification to that case lacked the "indubitable provenance" to dictate a ministerial act which
the trial court was compelled to perform, (5) we believe that this Court accurately set out the bases for
what constitutes a violation of due-process rights relating to such a situation. For instance, we
reiterate that our statement that "merely because a prosecutor once served as an accused's attorney
for a traffic ticket does not now automatically prohibit that attorney from prosecuting the accused
for murder," id. at 816, is a sound example of a situation wherein due-process violations are not
implicated by a subsequent adverse position of a prosecutor in a later prosecution. Even though, in
the older case in which Jennings represented Cooks, Jennings raised doubts of Cooks's sanity at that
time, Cooks has failed to show any link between the previous decade-old representation by Jennings
and the current case which would either have benefitted the State or would have acted to Cooks's
detriment. Absent such a link, Jennings was not disqualified from carrying out the duties imposed
on him by law to prosecute the murder case, a distinctly different case from that in which Jennings
previously represented Cooks.

 This point of error is overruled.

TESTIMONY REGARDING ORAL STATEMENT BY COOKS

 The testimony of which Cooks complains involves testimony about the statement made by
Cooks when he was awakened by nurse Sandra Marek at the hospital: "Did you find the body?" This
statement by Cooks was overheard by Marek and by Cecil Shelton, a deputy sheriff, both of whom
testified about this utterance over Cooks's objection. 

 The basis for Cooks's objection to this testimony rests in Article 38.22, Section 3 of the Texas
Code of Criminal Procedure, which states that "No oral or sign language statement of an accused
made as a result of custodial interrogation shall be admissible against the accused in a criminal
proceeding unless" it has been recorded and the recording shows the administration of certain
warnings set out in Article 38.22, Section 2. See Tex. Code Crim. Proc. Ann. art. 38.22, § 3
(Vernon 2005).

 At the time these witnesses testified concerning this statement, the trial court ruled that it was 
not made as the result of a custodial interrogation but, instead, was a spontaneous utterance, not
subject to the constraint mentioned above.

 Cooks's brief concentrates on the use of the word "utterance" by the trial court in making its
ruling, pointing out that the statement made by Cooks did not fit into the mold cast for excited
utterances. (If the statement were to have been properly classified as an excited utterance, then it
would be admissible pursuant to Rule 803(2) of the Texas Rules of Evidence.) 

 However, this use of the word "utterance" does not limit our review of this matter to the
application of Rule 803(2) to the introduction of excited utterances into evidence. Even when the
trial judge gives the wrong reason for his decision, Salas v. State, 629 S.W.2d 796, 799 (Tex.
App.--Houston [14th Dist.] 1981, no pet.), if the decision is correct on any theory of law applicable
to the case, it will be sustained. Osbourn v. State, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002). (6)

 Although it is plain that Cooks's statement was not an excited utterance which would be
admissible under that rule, it is a statement which was made spontaneously as he was awakened by
a nurse, not made as the result of a custodial interrogation. Article 38.22, Section 5 of the Texas
Code of Criminal Procedure specifically exempts "a statement that does not stem from custodial
interrogation" from those oral statements which are otherwise proscribed. See Tex. Code Crim.
Proc. Ann. art. 38.22, § 5 (Vernon 2005).

 Plainly, the custodial interrogation of Cooks had ceased for a time. Cooks fell asleep. When
he awoke, without prompting or urging, he blurted out the question which was then foremost in his
mind, inquiring whether the body of the dead man had been located. The statement, not being made
in the course of a custodial interrogation, was volunteered and does not fall within the prohibition
of Article 38.22 of the Texas Code of Criminal Procedure. See Tex. Code Crim. Proc. Ann. art.
38.22 (Vernon 2005). 

 For these reasons, there was no error in permitting the introduction of evidence regarding
Cooks's spontaneous outburst when awakened.

 We overrule this point of error.

JURY ERRED IN NOT FINDING COOKS LEGALLY INSANE?

 If there is a consistent theme which can be followed throughout the trial of Cooks, it is the
unanimity of the testimony of each of the three experts who testified that Cooks suffers from
schizophrenia and is very mentally ill. The conduct described by each of the witnesses who observed
Cooks on the day of the murder ratifies to any lay observer that he was in the throes of mental illness. 

 However, "Mere mental deficiency or derangement, though it may constitute a form of
insanity known to and recognized by medical science, does not excuse one for crime." Graham v.
State, 566 S.W.2d 941, 949 (Tex. Crim. App. 1978); Ross v. State, 153 Tex. Crim. 312, 220 S.W.2d
137, 144 (1949). Resendiz v. State, 112 S.W.3d 541, 548 (Tex. Crim. App. 2003), mentions the
distinction between being "crazy" or mentally ill as distinguished from legal insanity. The condition
of suffering from mental illness alone does not exculpate someone from his criminal act; rather, the
measure to be applied is that "as a result of severe mental disease or defect, [the defendant] did not
know that his conduct was wrong." Tex. Penal Code Ann. § 8.01 (Vernon 2003). Therefore, there
is a difference between the medical definitions for insanity and the legal definition of it. For our
purposes, therefore, the terms "insane" or "insanity" as used henceforth will be applied only to the
legal definition of the words as they apply to a defense against criminal prosecution and not to the
medical ones.

 Insanity is an affirmative defense to criminal charges (7) which must be proved by a
preponderance of evidence. Tex. Penal Code Ann. § 2.04 (Vernon 2003).

 Cooks now complains that it was error for the jury to have failed to find that Cooks met his
burden of proof concerning his insanity. 

 Whether a person is insane is a question of fact for a jury to determine, not a medical
question and not a question of law. Ultimately, the issue of insanity at the time of the offense
excusing criminal responsibility lies in the province of the jury, not only as to the credibility of the
witnesses and weight of the evidence, but also as to the limits of the defense itself. Graham, 566
S.W.2d at 953.

 [W]hen the courts of appeals are called upon to exercise their fact jurisdiction, that
is, examine whether the appellant proved his affirmative defense or other fact issue
where the law has designated that the defendant has the burden of proof by a
preponderance of evidence, the correct standard of review is whether after
considering all the evidence relevant to the issue at hand, the judgment is so against
the great weight and preponderance of the evidence so as to be manifestly unjust.


Meraz v. State, 785 S.W.2d 146, 154-55 (Tex. Crim. App. 1990).

 An examination of the facts presented shows, of course, the large number of lay witnesses
who testified about the irrational behavior demonstrated by Cooks on the day of the murder and the
day before it occurred. Evidence was presented that Cooks had been constrained in the recent past
at a psychiatric hospital in California. There were three psychiatric experts that testified that Cooks
was schizophrenic. The two psychiatrists called by the State testified that Cooks was not insane,
pointing out that his claim to the investigating policemen on the day of the murder that he was acting
in self-defense and his claim that he had done nothing wrong indicated that he had an awareness that
what he had done was, indeed, wrong. Frank Murphy, the psychiatrist called by Cooks, testified that
he had not been instructed to examine Cooks to test his ability to distinguish right from wrong and
that, judging from his responses during the interview with law enforcement officers, there was a
distinct possibility that he possessed that ability. The only person to testify that Cooks did not have
the capacity to distinguish right from wrong was Cooks's mother.

 In its questioning of witnesses and in its closing arguments, the State conceded that Cooks
was mentally ill; there is no controversy as to that issue. The controversy was whether his illness
was of the severity or the nature that he was insane at the time of the murder of Millis (i.e., that
Cooks did not recognize that the killing of Millis was a wrongful act). Things which go toward
meeting the burden of proof of Cooks's insanity were his delusions about his own identity, his
generally consistent irrational behavior, his call to law enforcement officials to inform them of the
situation at the Millis mobile home, and the testimony of Cooks's mother that Cooks could not
distinguish right from wrong. Evidence that Cooks made a rather lame attempt to hide Millis's body
by removing it to the wilds of Talley Bottoms is potent evidence that he recognized that the killing
was wrong and that he was attempting to conceal the act. Cooks's actions in taking someone to
Millis's mobile home after the murder and his feigning shock and surprise at the blood, together with
his telephone call to law enforcement offices could be construed as an inept attempt to draw
suspicion of his involvement in the murder away from him. The testimony of three psychiatric
professionals that his mental illness did not impair his ability to distinguish right from wrong is very
compelling evidence. The jury has the opportunity to hear the evidence as given and thereby
determine the credence to give to the witnesses and the weight to apply to their testimony.

 In a factual sufficiency review, it is our duty to review all the evidence in a neutral light and
determine whether the evidence supporting the verdict is so weak or is so outweighed by the great
weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly
unjust. Roberts v. State, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); Marshall v. State, 210
S.W.3d 618, 625 (Tex. Crim. App. 2006); Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim.
App. 2006); Wesbrook v. State, 29 S.W.3d 103, 112 (Tex. Crim. App. 2000); Clewis v. State, 922
S.W.2d 126, 134 (Tex. Crim. App. 1996).

 The insanity defense was the burden of Cooks to prove. A jury reasonably found that he
failed to meet that burden of proof. We do not find fault with that finding and will not disturb it.

 We reject this point of error.

WAS THE EVIDENCE LEGALLY AND FACTUALLY SUFFICIENT?

 Although Cooks breaks this question into portions, these issues will be addressed together.

 The standard for factual sufficiency review is stated above and is not repeated here.

 In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light
most favorable to the verdict and determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. Johnson v. State, 23 S.W.3d 1, 7 (Tex.
Crim. App. 2000). Although our analysis considers all evidence presented at trial, we may not
re-weigh the evidence and substitute our judgment for that of the jury. King v. State, 29 S.W.3d 556,
562 (Tex. Crim. App. 2000). In essence, if the evidence as presented in a criminal case has not met
the standard of legal sufficiency, it should never have been presented to the jury in the first place.
Hyett v. State, 58 S.W.3d 826, 830 (Tex. App.--Houston [14th Dist.] 2001, pet. ref'd). A conviction
based on evidence insufficient to meet a legal sufficiency challenge is a denial of the due-process
rights guaranteed under the United States Constitution. 

 A detailed reiteration of the chronological occurrences in this case would be redundant. As
mentioned before, the evidence--though circumstantial--is voluminous; all of it points solely to
Cooks as having murdered Millis. The motive is murky; one cannot determine if Cooks was first
led to commit the crime to steal Millis's truck, money, and clothes or was prompted by the demons
of his irrational thought patterns with the thefts as an afterthought. However, the motive is
secondary to the fact that the overwhelming evidence of guilt satisfies both the legal and factual
standards set out above. 

 We overrule this point of error.

 We affirm the judgment.



 Bailey C. Moseley

 Justice


Date Submitted: January 3, 2008

Date Decided: February 6, 2008


Do Not Publish


1. Miranda v. Arizona, 384 U.S. 436 (1966).
2. Tex. Code Crim. Proc. Ann. art. 2.01 (Vernon 2005).
3. Tex. Disciplinary R. Prof'l Conduct 1.09(a), reprinted in Tex. Gov't Code Ann., tit. 2,
subtit. G app. A (Vernon Supp. 2007).
4. In re Goodman, 210 S.W.3d 805 (Tex. App.--Texarkana 2006, orig. proceeding).
5. State ex rel. Young v. Sixth Judicial Dist. Court of Appeals at Texarkana, 236 S.W.3d 207,
212 (Tex. Crim. App. 2007), in which the Texas Court of Criminal Appeals did observe that while
the rules concerning prosecutor disqualification in a different case did not then explicitly exist, those
set out in Goodman "may well ultimately prove the appropriate rule of law in criminal cases."
6. Actually, it does not appear that the trial judge allowed introduction of the evidence for the
wrong reason anyway. Although he used the word "utterance" in making his ruling when the
evidence was introduced through Shelton, he called it a "spontaneous" statement when presented
through the testimony of Marek; this was correct. 
7. Tex. Penal Code Ann. § 8.01.