**Ram SITARAM and Tom Naug, Appellants,**

v.

**AETNA U.S. HEALTHCARE OF NORTH TEXAS, INC., and NYLCare Health Plan, Inc., Appellees.**

No. 06–03–00089–CV.

Court of Appeals of Texas, Texarkana.

Submitted Nov. 12, 2004.

Decided Dec. 23, 2004.

Rehearing Overruled Jan. 25, 2005.

Barrett W. Stetson, Law Firm of Barrett W. Stetson, S. Stewart Frazer III, Dallas, for appellants.

John B. Shely, M. Katherine Strahan, Dennis N. Ryan, Andrews & Kurth, LLP, Dallas, for appellees.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice ROSS.

Ram Sitaram and Tom Naug (together, Sitaram[1]), independent insurance agents, sued Aetna U.S. Healthcare of North Texas, Inc. (AUSHC) and NYLCare Health Plans, Inc. (NYHPI) for breach of a settlement agreement. The trial court granted summary judgment in favor of AUSHC and NYHPI, and Sitaram appeals.

A substantial number of corporate acquisitions by Aetna, Inc. (Aetna), and a divestiture order, resulting from an antitrust action in federal court, led to questions of whether Aetna or one of its subsidiaries became liable under a settlement agreement entered into by Sitaram and Texas Sanus Health Plan, one of the purchased corporations. Ultimately, the issue is whether the summary judgment evidence raised a genuine issue of material fact regarding whether one of Aetna's corporate entities was a "successor in interest" under the settlement agreement at issue. Because the record does not reveal a fact issue regarding whether one of Aetna's corporate entities assumed, either by statute or express agreement, Sanus' (now NYLCare SW's) liabilities, we affirm the summary judgment.

**1.** Naug died October 26, 2003. Sitaram, acting as executor of Naug's estate, moved this Court to allow him to act as a substitute for Naug in this appeal. We granted Sitaram's motion, allowing him to represent himself

## I. FACTUAL AND PROCEDURAL HISTORY

### A. The GTE Contract and a Settlement Among the Parties (1989–1993)

In 1989, Sitaram obtained GTE (now Verizon) as a client for Sanus. All parties agree that, for approximately five years, Sanus paid Sitaram one percent of the gross premiums paid by GTE for healthcare coverage.

In 1993, Sanus ceased making payments to Sitaram. This caused a dispute between Sitaram and Sanus, which was resolved through a settlement agreement that same year. Sitaram's claims in the lawsuit underlying this appeal center on three provisions of this 1993 Settlement:

(1) .... The obligations of this Agreement may not be avoided by a change of name or location, sale or transfer of these [GTE] accounts to any parent, subsidiary or affiliate. In the event of a sale, merger, or acquisition of SANUS, this Agreement shall be binding upon the successor in interest.

. . . .

(5) SANUS agrees to future payments equal to one percent (1%) of the net premium received from GTE from October 1, 1993, until such time as GTE is no longer a client of SANUS for all of the GTE divisions doing business with SANUS as of October 1, 1993, . . . .

. . . .

(13) It is understood and agreed that this Agreement shall be binding upon and inure to the benefit of the parties

individually and as representative of Naug's estate. For clarity's sake throughout this opinion, we will not refer to Sitaram's dual capacity on appeal and, instead, refer to Sitaram and Naug, together, as "Sitaram."

hereto and their respective heirs, representatives, successors, and assigns.

At some point in the years between 1993 and 1998, Sanus became NYLCare SW. The record does not delve into this transition, and it is not important to the central issue in this appeal other than to identify the parties. Again, the parties do not dispute that NYLCare SW (formerly Sanus) paid Sitaram pursuant to the 1993 Settlement through 1998.

### B. Aetna's Acquisition of NYHPI (including NYLCare SW) (1998)

█ In 1998, Aetna and New York Life Insurance Company entered into an asset purchase agreement (APA) whereby Aetna purchased NYHPI, the parent corporation of NYLCare SW.[2] Aetna thereby became the ultimate parent corporation of NYHPI and its subsidiaries, including NYLCare SW. After the transaction was finalized, AUSHC and NYLCare SW, competitors in the North Texas market before 1998, became sister affiliates, and their relationship is the focus of this appeal.

The terms of this purchase are set out in Article 2 of the APA. Sitaram focuses on certain definitions and provisions in the APA between Aetna and New York Life. Specifically, they look to the definition of "excluded liabilities" as, among others, "all Liabilities of [NYHPI] or any Subsidiary

of [NYHPI] to the extent they do not arise out of or relate to [NYHPI]."

### C. AUSHC and NYLCare SW Relationship: Negotiations to "Renew" GTE Contract (1998–1999)

From March 1998 to June 1999, Sitaram continued to receive payments pursuant to the 1993 Settlement. According to the summary judgment evidence, the process of integrating certain functions of AUSHC and NYLCare SW began after the acquisition in the spring of 1998. Functions such as marketing, sales, and certain administrative services for NYLCare SW were coordinated with those of other Aetna affiliates, including sister affiliate AUSHC.

In the spring of 1999, GTE began to solicit proposals from several Dallas area health plans for its employee healthcare coverage for 2000. In May 1999, AUSHC submitted a proposal to GTE. AUSHC and NYHPI concede NYLCare SW did not initially submit a separate option to GTE. Instead, the AUSHC plan was "jointly presented to GTE on behalf of AUSHC and NYLCare SW." Negotiations between AUSHC/NYLCare SW and GTE then began. The record contains several hundred e-mail messages from within the corporations regarding the "GTE Renewal Presentation."

---

**2.** Had this transaction constituted a merger of Aetna and NYHPI, Sitaram would have been afforded special protections. *See* TEX. BUS. CORP. ACT ANN. art. 1.02(A)(18) (Vernon Supp. 2004–2005). In the instance of a merger, in the absence of specific language to the contrary, both assets and liabilities of the acquired entity are transferred to the surviving entity. *See Duke Energy Field Servs. Assets, L.L.C. v. Nat'l Union Fire Ins. Co.*, 68 S.W.3d 848, 851 (Tex.App.-Texarkana 2002, pet. denied). Here, the transaction between Aetna and New York Life was an asset purchase agreement rather than a merger. *See In re*

*Cap Rock Elec. Coop., Inc.*, 35 S.W.3d 222, 228 (Tex.App.-Texarkana 2000, no pet.) (1991 merger agreement titled "An Agreement to Combine . . ." provided that one entity was to be legally dissolved and all members of the dissolved entity automatically became members of the surviving entity with their patronage capital vested in the surviving entity). Here, we note the nature of the transaction as evidenced by the APA and the ample evidence that NYLCare SW continued to exist after the transaction. Therefore, Sitaram does not enjoy the protections offered had this transaction constituted a merger.

### D. Antitrust Action and End of NYL-Care SW and GTE Relationship (June–December 1999)

In June 1999, this arguably collaborative effort between AUSHC and NYLCare SW ended when a federal court ordered Aetna and its subsidiaries to divest itself of certain Texas healthcare subsidiaries, NYLCare SW included.[3] Pending the divestiture, Aetna was ordered to hold out those subsidiaries as competing health plans.

It was only after the federal court order when NYLCare SW made a separate proposal to GTE for employee healthcare coverage for the year 2000. Ultimately, GTE, uncertain as to the future of NYLCare SW, rejected NYLCare SW's separate, later proposal and instead chose to do business with AUSHC. GTE formally ceased doing business with NYLCare SW in January 2000.

From the time the federal court issued its divestiture order until the completion of the divestiture, NYLCare SW "continued to be held out as a competitor" of AUSHC in the Dallas area. NYHPI sold NYLCare SW to Health Care Service Corporation in March 2000.

### E. AUSHC's Business Relationship with GTE and Early Stages of Litigation

GTE continued to do business with AUSHC until January 1, 2002.[4] In February 2001, Sitaram filed suit against AUSHC for breach of the 1993 Settlement. Sitaram alleged that AUSHC became a "successor in interest" under the terms of the 1993 Settlement and that AUSHC was liable to them under that agreement for premiums GTE paid to AUSHC during the years 2000 and 2001.

AUSHC moved for summary judgment on the ground that Sitaram had sued the wrong party. In response, Sitaram moved for leave to join five additional Aetna entities as parties. In an effort to reduce the amount of discovery, the trial court ordered AUSHC to stipulate as to the Aetna entity, if any, that would possibly be liable under Sitaram's theory of recovery. AUSHC designated in writing that NYHPI is the only party against whom Sitaram could pursue their claims:

> To the extent that having at one time been the parent corporation of Sanus [now NYLCare SW] creates any potential legal obligation against any Aetna entity under [NYLCare SW's] agreement with Plaintiffs, which AUSHC expressly denies, AUSHC stipulates that NYHPI is the only Aetna entity against which Plaintiffs could pursue their claim.

### F. Sitaram's Claims and AUSHC's and NYHPI's Motions for Summary Judgment

In its amended petition, Sitaram made the following allegations:

#### IV.

Alternatively, and without prejudice to the foregoing, Plaintiffs allege that NYHPI is the successor in interest. Plaintiff[s] further allege[ ] that after acquiring NYLCare [SW] that "NYHPI" assigned or gave the GTE account to AUSHC. Plaintiff[s] allege[ ] that NYHPI directed and controlled the GTE account after the acquisition of NYLCare [SW].

. . . .

---

3. *See United States v. Aetna Inc.*, No. 3–99CV 1398–H, 1999 WL 1419046 (N.D.Tex. Dec. 7, 1999).

4. According to figures provided by AUSHC and NYHPI, the premiums GTE paid to AUSHC for the years 2000 and 2001 were $12,096,471.00.

## VI.

In 1998, Sanus then doing business as NYLCare [SW], was sold to Aetna. During the calendar year of 1999 Aetna ... paid Plaintiffs pursuant to the 1993 settlement agreement. Aetna was a successor in interest to NYLCare [SW] f/d/b/a Sanus Texas Health Plan Inc. as that term is affirmed in the settlement agreement.

AUSHC moved for summary judgment on the following two grounds:

A. AUSHC is neither a party to the [1993 Settlement] nor a successor-in-interest to the contracting party, and, therefore, is not bound by the terms of the [1993 Settlement].

B. There has been no breach of the [1993 Settlement] because there has been no obligation of payment since GTE terminated its business relationship with NYLCare SW.

Similarly, NYHPI moved for summary judgment on the following two grounds:

1. NYHPI remained a separate corporation from NYLCare SW and, as a matter of law, is not liable for any obligation of NYLCare SW under the [1993 Settlement]; and

2. There is no breach of the [1993 Settlement] because there has been no obligation of payment since GTE terminated its business relationship with NYLCare SW.

The trial court granted summary judgment on both grounds as to both parties.[5]

Summary judgment was expressly not granted on the ground that Sitaram had sued the wrong corporate affiliate.

## II. ADDITIONAL STIPULATION ISSUE

■ As noted, following AUSHC's motion for summary judgment based on the ground that Sitaram had sued the wrong entity, Sitaram moved for leave to join five additional parties. To avoid the delay and paperwork involved in such a joinder, the trial court ordered AUSHC to stipulate as to which Aetna entity, if any, would be liable under Sitaram's allegations. AUSHC designated NYHPI, NYLCare SW's former parent corporation, as such entity.

Sitaram's counsel was perplexed by the designation of NYHPI as the potentially liable party since NYHPI did not appear to be involved in this matter to such an extent. When he expressed his concern regarding NYHPI's role in this matter and his confusion over AUSHC's identifying NYHPI as the potentially responsible party, opposing counsel referred to the written stipulation: "He has the stipulation, Your Honor, and that's—that's better than reams of discovery." Then the following exchange occurred:

[Sitaram's Counsel]: I'll take them at their word then that that's—that if we prove it as—if we prove [AUSHC] retains the account, then [NYHPI] would be responsible for the payment of the commission.

---

5. Citing *Malooly Bros., Inc. v. Napier,* 461 S.W.2d 119 (Tex.1970), AUSHC and NYHPI argue that the Court should affirm the trial court's summary judgment because Sitaram failed to challenge one of the two grounds on which AUSHC and NYHPI sought and received summary judgment. We have treated Sitaram's issues as fairly including subsidiary issues. *See* Tex.R.App. P. 38.1(e). By arguing that another corporate entity became a suc-

cessor in interest to the GTE account, Sitaram impliedly challenge AUSHC and NYHPI's ground that the 1993 Settlement expired by its own terms when GTE no longer did business with NYLCare SW. By order dated January 27, 2004, we granted Sitaram's request to supplement its brief with one which separately addresses this issue. *See* Tex.R.App. P. 38.7.

THE COURT: Is that fair?

[AUSHC and NYHPI's Counsel]: As stipulated.

THE COURT: Okay. All right, fine.

[Sitaram's Counsel]: That works for me.

It is this exchange from which Sitaram's counsel understood that a new stipulation was reached.

## A. Composition of a Rule 11 Agreement

Rule 11 provides that "[u]nless otherwise provided in these rules, no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record." TEX.R. CIV. P. 11; *London Mkt. Cos. v. Schattman*, 811 S.W.2d 550, 552 (Tex. 1991).

■■■ We must determine the intention of the parties in a trial stipulation from the language used in the entire agreement "in the light of the surrounding circumstances, including the state of the pleadings, the allegations therein, and the attitude of the parties in respect of the issues." *Herschbach v. City of Corpus Christi*, 883 S.W.2d 720, 734 (Tex.App.-Corpus Christi 1994, writ denied); *Discovery Operating, Inc. v. Baskin*, 855 S.W.2d 884, 886–87 (Tex.App.-El Paso 1993, orig. proceeding); *Mann v. Fender*, 587 S.W.2d 188, 202 (Tex.Civ. App.-Waco 1979, writ ref'd n.r.e.). The trial court should disregard the stipulation if it is ambiguous and uncertain in its terms. *Herschbach*, 883 S.W.2d at 734. To have a binding, open-court stipulation, the parties must dictate into the record all material terms. *Id.*

## B. The Record Does Not Clearly Demonstrate the Parties Agreed to an Additional Stipulation

■■ The process by which AUSHC designated NYHPI as the party who would have been liable is not entirely clear,[6] and Sitaram's counsel believed the parties had agreed to a new, clearer stipulation. However, the record does not support such a conclusion for two related reasons: 1) the uncertainty of the alleged oral agreement and AUSHC's and NYHPI's assent thereto, and 2) the circumstances surrounding the execution of the prior written stipulation. *See id.; Baskin*, 855 S.W.2d at 887.

First, Sitaram's counsel's remarks concerning NYHPI did not thoroughly state the terms of any stipulation. More importantly, AUSHC and NYHPI's counsel did not clearly agree to the stipulation. AUSHC and NYHPI's counsel's remark, "As stipulated," appears to be a reference to the earlier written stipulation, rather than an expression of agreement to a new, oral stipulation. Based on this record, we cannot say the parties entered into a new stipulation. *See Herschbach*, 883 S.W.2d at 734; *Baskin*, 855 S.W.2d at 887.

Second, from the discussion surrounding the written stipulation, it is clear AUSHC and NYHPI were entering into the original stipulation for the sole purpose of limiting discovery and expressly rejected the notion the stipulation was an admission of liability. The trial court confirmed this purpose of the stipulation:

THE COURT: Well, I don't want to box them in. I want them to go back and say—make sure they understand what you're alleging, and then say: We don't think any Aetna entity owes you a dime, but under what you're alleging in

---

**6.** We recognize that the parties' stipulation forecloses us from going behind the agreement to examine the issues to which the parties stipulated. *See Missouri Pac. R.R. Co. v. Whittenburg & Alston*, 424 S.W.2d 427, 428 (Tex.1968).

your view of the world if we accepted that as true, it would be this Aetna entity. That's all I'm trying to get to. And it will not be in any way an admission of liability or anything by anyone. It's just going to get us past this issue of trying to decide who we're suing.

Based on these statements, we cannot agree with Sitaram's position that the exchange at issue represented a stipulation that NYHPI would be liable if Sitaram showed that any Aetna entity obtained the GTE account for the years 2000 and 2001. We conclude the record does not clearly demonstrate that AUSHC and NYHPI agreed to this additional, oral stipulation, which would effectively stipulate them out of court since, on these facts, such a stipulation would serve as an admission of liability.

The questioned exchange is uncertain in its terms and whether there was any agreement at all, and the circumstances surrounding the alleged agreement undermine its existence in that AUSHC and NYHPI clearly did not intend to admit liability in the matter. The trial court properly disregarded this alleged, additional agreement. We overrule Sitaram's contention.

## III. SUMMARY JUDGMENT

Having concluded the parties did not enter into a Rule 11 agreement that NYHPI was liable if the evidence showed any Aetna entity obtained the GTE contract, we must now determine if the record contains a genuine issue of material fact concerning whether AUSHC or NYHPI became a successor in interest pursuant to the 1998 APA between Aetna and New York Life.

### A. Standard and Scope of Review

We review the granting of a traditional motion for summary judgment de novo. *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex.1994). We are only to determine from the summary judgment evidence whether there is any genuine issue of material fact to try. *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 510 (Tex.1995). We accept as true evidence favoring the nonmovant, indulging every reasonable inference and resolving all doubts in the nonmovant's favor. *Id.; Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

### B. Who Is and Is Not a "Successor in Interest"

It is fundamental that a contract is not binding on a nonparty. *See Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 337, 341 (Tex.1968). Therefore, in order for the 1993 Settlement to have been in effect during the years 2000 and 2001, a successor in interest was required because it is uncontroverted that GTE opted to not do business with NYLCare SW as of January 1, 2000.

We begin with the general presumption in Texas: Courts will recognize the separate identities of corporations even when one corporation dominates or controls another, or even treats the other corporation as a mere department, instrumentality, or agency of the other. *Pulaski Bank & Trust Co. v. Tex. Am. Bank/Fort Worth, N.A.*, 759 S.W.2d 723, 731 (Tex. App.-Dallas 1988, writ denied); *Norton v. Integral Corp.*, 584 S.W.2d 932, 935 (Tex. Civ.App.-Austin 1979, no writ). This presumption applies to a parent corporation and its separate corporate subsidiary as well, presuming, again, they are distinct legal entities. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex.2002).

The Texas Business Corporation Act governs the liability of an acquiring corporation:

B. A disposition of any, all, or substantially all, of the property and assets of a corporation, whether or not it requires the special authorization of the shareholders of the corporation, effected under Section A of this article ... or otherwise:

(1) is not considered to be a merger or conversion pursuant to this Act or otherwise; and

(2) except as otherwise expressly provided by another statute, does not make the acquiring corporation ... responsible or liable for any liability or obligation of the selling corporation that the acquiring corporation ... did not expressly assume.

TEX. BUS. CORP. ACT ANN. art. 5.10(B) (Vernon 2003); *C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 778 (Tex.App.-Houston [1st Dist.] 2004, no pet.). In other words, the purchase of all or substantially all of the property or assets of the seller corporation "does not make the acquiring [entity] responsible or liable for any liability or obligation of the selling corporation *unless the acquiring entity expressly assumes the liability or obligation,* or unless another statute expressly provides to the contrary." *Shapolsky v. Brewton,* 56 S.W.3d 120, 137 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (emphasis added)

(citing TEX. BUS. CORP. ACT ANN. art. 5.10(B)(2)).

■ When used as a legal term applying to corporations, the term "successor" has a restricted meaning. *See Farm & Home Sav. Ass'n v. Strauss,* 671 S.W.2d 682, 685 (Tex.App.-Dallas 1984, no writ). With respect to corporations, "successor" does not ordinarily mean an assignee. *Id.* Rather, a "successor" is normally used in respect to corporate entities to describe the status of a corporation which has become vested with the rights and has assumed the burdens of another corporation by amalgamation, consolidation, or duly authorized legal succession, and does not contemplate acquisition by ordinary purchase from another corporation.[7] *Id.*

## C. Neither AUSHC nor NYHPI Assumed the Obligation To Pay Per the 1993 Settlement

■ To be successful in this appeal, Sitaram must show there is some fact issue remaining regarding whether AUSHC (former sister corporation) or NYHPI (former direct parent corporation) is a successor in interest to NYLCare SW.[8] Even though the 1993 Settlement purported to bind "successors and assigns," such an agreement cannot contravene the protections afforded Aetna by Article 5.10(B)

---

**7.** Other jurisdictions have cited *Strauss* and agreed that the term "successor in interest," when used with respect to corporate mergers and acquisitions, is a term with a meaning beyond mere acquisition. *See Aldrich v. ADD Inc.*, 437 Mass. 213, 770 N.E.2d 447, 453 (2002); *Larkin v. City of Burlington,* 172 Vt. 566, 772 A.2d 553, 557 (2001).

**8.** Texas strongly embraces the nonliability rule. *Lockheed Martin Corp. v. Gordon,* 16 S.W.3d 127, 139 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). Article 5.10(B) eliminates the "de facto merger" doctrine, the third exception to the nonliability rule under the Restatement. *See* TEX. BUS. CORP. ACT ANN. art. 5.10(B)(1); *see also Suarez v. Sherman Gin*

*Co.*, 697 S.W.2d 17, 20 (Tex.App.-Dallas 1985, writ ref'd n.r.e.) (finding "the legislature's prompt action to override" *W. Res. Life Ins. Co. v. Gerhardt,* 553 S.W.2d 783 (Tex.Civ. App.-Austin 1977, writ ref'd n.r.e.), and "statutorily preclude application of the de facto merger doctrine in Texas clearly states a public policy opposed to the doctrine"). In *Mudgett v. Paxson Mach. Co.*, 709 S.W.2d 755, 758–59 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.), the Corpus Christi Court of Appeals rejected the "mere continuation" theory, the fourth exception recognized by the Restatement, as contrary to the legislative intent of Article 5.10(B).

when it purchased the assets of NYHPI. *See C.M. Asfahl Agency,* 135 S.W.3d at 781. Under the law on these facts, only two scenarios may result in the conclusion that Aetna assumed NYLCare SW's liability under the 1993 Settlement: 1) a statute expressly provides that, on these facts, Aetna became liable for the 1993 Settlement obligations, or 2) Aetna expressly assumed this liability in the 1998 APA. Of course, because neither AUSHC nor NYHPI was a party to the APA, we recognize that, even if Aetna assumed the obligation, another analytical step would be required to determine whether AUSHC or NYHPI, both subsidiaries of Aetna, would be liable for an obligation assumed by their parent corporation.

### 1. No Assumption Per Statute

Sitaram does not point us to—and we have not found—any statutory authority which expressly provides for assumption of liability under these facts. The record does reveal significant evidence that AUSHC and NYLCare SW had begun to integrate many corporate resources. Notably, there is also evidence Aetna paid Sitaram pursuant to the 1993 Settlement during 1999 when AUSHC and NYLCare SW were acting as sister corporations. The record also contains a great deal of evidence that AUSHC and NYLCare SW collaborated on the GTE renewal project and that AUSHC used NYLCare SW's information and its status as an incumbent in good standing to negotiate a deal with GTE. There is evidence, too, that Aetna planned to (and arguably had begun to) integrate the two corporations. Aetna executive Nathan Eudaly, II, stated that there were plans to "convert all NYLCare [SW] paper" into Aetna paper, but those "plans were never carried through" and

AUSHC and NYLCare SW remained separate and distinct HMOs at all times.

In their response to AUSHC's motion for summary judgment, Sitaram asserted that eleven of the 1999 monthly payments were made to them via electronic funds transfer from Aetna. The summary judgment evidence lends some support to this assertion, providing two check stubs from payments made by Aetna Services, Inc., based in Hartford, Connecticut, and two remittance slips confirming deposit of funds via electronic transfer by "Aetna." Other documentation on NYLCare SW's letterhead provides a listing of the dates and amounts of each payment for 1999, but does not indicate the source of the payments. Eudaly stated that, at some point, Aetna took over this function, but he maintained that the payments "came from and on behalf of [NYLCare SW]."

Clearly, questions of fact are raised by the evidence of integration and the evidence of the purchasing corporation paying Sitaram's commissions pursuant to the 1993 Settlement. These fact issues, however, are not material to the existence or application of any statutory authority under which Aetna could be said to have assumed NYLCare SW's liabilities. *See* TEX. BUS. CORP. ACT ANN. art. 5.10(B). We are unable to find any statutory authority which would allow such evidence to support a conclusion that the acquiring corporation became a successor in interest.

### 2. No Express Assumption Per Agreement

■ Second, under the APA between Aetna and New York Life,[9] Aetna does not expressly assume NYLCare SW's liabilities and obligations. Sitaram argues that the APA's definition of "excluded liabilities" represents an express assumption by

---

9. Not reproduced in full in the record.

Aetna. To arrive at this conclusion, Sitaram asks us to follow them on a series of conclusions.

Their construction begins with a portion of the definition of "excluded liabilities": "Liabilities of [NYHPI] or any Subsidiary of [NYHPI] to the extent they do not arise out of or relate to the NYL Health Care Business." They argue that whatever is not excluded in this definition is included. Because the 1993 Settlement "arises out of or relates to the NYL Health Care Business," then the liabilities under the 1993 Settlement are not excluded. Rather, Sitaram contends this liability is an included liability. There are at least three flaws in this conclusion.

First, it conflicts with Article 5.10's language requiring *express* assumption. Sitaram's conclusion centers on the implied converse of the definition of "excluded liabilities," rather than any express language indicating Aetna's intent to assume liability under the 1993 Settlement.

Second, the import of the entire lengthy definition of "excluded liabilities" appears to address the liabilities of NYHPI or its subsidiaries, such as NYLCare SW, for which New York Life would no longer be potentially liable as the parent corporation.

Finally, the only other reference to "excluded liabilities" in that portion of the APA before us is not a reference to assumption of liability by Aetna. Rather, the term is used with reference to what must be and need not be included on the "Preliminary Closing Balance Sheet" to be provided on the closing of the purchase between Aetna and New York Life. "Excluded liabilities," according to the APA, need not be included in this documentation. It is a tenuous connection we would have to make to read this reference as an assumption of liability by Aetna, and a far more tenuous connection to go so far as reading this as an assumption of liability by nonparty subsidiaries AUSHC or NYHPI. Sitaram's usage of "excluded liabilities" stretches the use of this term in the APA beyond what either party plainly intended. The record therefore does not reveal remaining genuine issues of fact regarding whether, in the APA, Aetna expressly assumed NYLCare SW's obligations to Sitaram.

## IV. CONCLUSION

The parties agree that, in order for there to be any obligation under the 1993 Settlement, there must have been a successor in interest to the 1993 Settlement. As used with respect to corporations, the term "successor" has a specialized meaning beyond simple acquisition. Texas courts generally recognize the distinction among corporate affiliates, even when one clearly dominates the other. In order for there to be a successor in interest, Aetna was required to expressly assume the liabilities of NYHPI, or there must be another statute which expressly provides for such assumption of liability on these facts. *See* TEX. BUS. CORP. ACT ANN. art. 5.10(B); *Shapolsky*, 56 S.W.3d at 137. We have found no such language in the 1998 APA and no such statutory authority.

While we find some evidence giving rise to genuine issues of fact, these fact issues have no bearing on the material issue here, i.e., whether AUSHC or NYHPI assumed liability pursuant to either statutory provision or by agreement. Thus, we cannot conclude that the record demonstrates a remaining genuine issue of *material* fact.

We overrule Sitaram's points of error and affirm the summary judgment.