**Opinion filed January 20, 2022**



In The

# Eleventh Court of Appeals

_____

## No. 11-20-00028-CV
_____

### TIM FOOTE AND KEITH CYPERT, Appellants

### V.

### TEXCEL EXPLORATION, INC. AND TOMMY DECKER, Appellees

On Appeal from the 50th District Court

Knox County, Texas

Trial Court Cause No. 9943

## O P I N I O N

This is an appeal from a take-nothing jury verdict involving a claim for injury to cattle that were injured when they entered the area where oil and gas operations were occurring.

Appellants, Tim Foote and Keith Cypert, brought suit for damages to cattle killed and injured on and in the area surrounding the area of operations for an oil and gas lease known as the Elizabeth Hertel Lease (the Hertel Lease) in Knox County.

Appellants alleged that Texcel Exploration, Inc. and its agent, Tommy Decker (Decker), negligently failed to construct and maintain an adequate fence around the wellsite and tank battery at the Hertel Lease, which created a dangerous condition on the property that proximately caused the death and injury of the cattle. The parties argued the case below on the theories of premises liability and negligent undertaking. The jury found that the cattle were not licensees at the time of their injury. Based on this finding by the jury, the trial court entered a take-nothing judgment.

Appellants raise six issues for our review, contending that there were multiple errors in the trial court's charge, that the jury's verdict was against the great weight and preponderance of the evidence, that the trial court erred in failing to render a partial judgment in their favor based on an in-court stipulation, and that the trial court erred in denying their motion for new trial based on an allegation of juror misconduct. We affirm.

*Background Facts*

James Styles and his wife own a parcel of land in Knox County. The Hertel Lease is located on their property. In April of 2017, the Styleses had leased the land to Macky Yates, conveying to him the right to possess the whole parcel in exchange for cash. Styles testified that Yates grew wheat on the property and that Yates had the right to lease the property to others for grazing. Styles also testified that Texcel was the operator of the Hertel Lease. The mineral lease did not require Texcel to fence off its portion of the property or its equipment.

Foote, an experienced farmer and rancher, made arrangements to graze his cattle in Knox County, paying Cypert by the head to take care of them. Cypert made arrangements with Yates for 650 head of Foote's cattle to be placed on the Styleses' property in Knox County. While making the arrangements, Foote traveled to Knox County, met with Cypert, and went to look at Cypert's operation and facilities.

2

However, Foote testified that he never went to the Yates pasture before sending his cattle.

Decker is the pumper for Texcel on the Hertel Lease. As the pumper, Decker checked on the Hertel Lease every day around 8:00 a.m. Yates notified Decker before the cattle were turned out, and Decker notified David Stapp, Texcel's owner. Stapp instructed Decker to call Texcel's electrician, Rick Decker,[1] to make sure the electric fence around the wellsite and tank battery of the Hertel Lease was working. Decker testified that he had to call Stapp because he did not have the authority to make expenditures on the Hertel Lease.

The fence at issue was a single-wire electric fence. The fence was constructed with metal T-posts holding a single electric wire strung on prongs on an insulator. As long as the wire is on the insulator, the fence is on or "hot." If the wire falls to the ground or otherwise hits brush or other material, it can ground out and is no longer hot. Rick Decker, Veterinarian James Gober, and Cypert all testified that a single-wire electric fence is frequently used and can be effective for turning or restraining cattle.

Foote pastured more than 650 head of cattle on the pasture around March 22, 2017. Decker testified that as soon as the cattle were turned out, they began to knock down the fence and get inside the operations area of the Hertel Lease by the tank battery. He testified that he called Stapp, who told Decker to have the fence repaired. Decker further testified that Rick Decker checked to see that the fence was still hot but that the cattle continued to get inside the fenced area. Decker testified that he would "shoo" the cattle out, replace the wire on the insulator, and make sure the wire was hot. Decker testified that he told Cypert's employee that the cattle were tearing the fence down every day. Cypert testified that he never saw cows in the area around

---

[1]The parties indicate that Rick Decker and Appellee Tommy Decker are not related.

the tank battery and that Decker never told him that the cattle were tearing down the fence. However, Cypert also testified that the cattle had knocked down the fence on a couple of occasions and that he had set it back up and made adjustments.

The cattle were injured on April 4, 2017. That morning, Decker arrived around 8:00 a.m. to check the well and equipment. He testified that when he left the well, the fence was up and was hot. That afternoon, Cypert arrived to check on the cattle and discovered oil and saltwater on the cows, in the tank battery area, and in the pasture. Sometime during the day, the cattle pushed through the fence and broke a PVC pipe on a tank holding saltwater and oil, which caused a spill. Cypert called Decker between 2:00 and 3:00 p.m. to alert him of the oil spill. Cypert estimated that around 300 of the cows were inside, or had been inside, the area that was originally fenced.

After the accident, Stapp remediated the spill and notified the Railroad Commission that he planned to have a new fence constructed around the tank battery. Cypert and Foote relocated the sick cattle, but the healthy cattle remained on the Yates pasture. Before Stapp could have someone put up a new fence, Cypert had new T-posts and barbed wire installed. Cypert paid for the new fencing, and Texcel refused to reimburse Cypert. Stapp testified that because Cypert installed a new fence, he "didn't feel like [he] needed to" pay for or install a new fence himself.

Foote testified that 132 head of cattle died as a result of ingesting oil. His damages included veterinary bills, special feed, shipping cost to relocate cattle from the Yates pasture, and lost profits from the surviving cattle being sold under the expected weight. Cypert alleged damages in the amount of $2,178 for a new five-wire barbed-wire fence.

After the jury found that the cattle were not licensees, the trial court entered a take-nothing judgment in favor of Texcel and Decker. Appellants filed a motion for new trial wherein they alleged juror misconduct on the basis that Juror Wilde

4

purposely withheld information during voir dire about a "physical altercation" between her husband and Cypert. Specifically, Appellants alleged that Juror Wilde did not disclose this information when asked if "she knew Plaintiff Cypert or knew of him." Appellants' motion for new trial was overruled by operation of law. This appeal followed.

*Analysis*

*Premises Liability – Allegation of Jury Charge Error*

We note at the outset that the law applicable to a case of this type has been well established in Texas jurisprudence. As summarized by the El Paso Court of Appeals in *Santana Oil Co. v. Henderson*:

> [T]he owner/lessee of the surface estate in order to recover against the mineral lessee or operator for injury to his cattle must plead, prove and obtain a jury finding on one of the following:
>
> • That the lessee/operator intentionally, wilfully or wantonly injured the cattle; or
>
> • That the lessee/operator used more land than was reasonably necessary for carrying out the purposes of his lease and that as a result of some negligent act or omission on his part, he proximately caused an injury to the surface owner/lessee's cattle.

855 S.W.2d 888, 889–90 (Tex. App.—El Paso 1993, no writ). Appellants neither sought nor obtained jury findings on either of the two viable theories of liability recognized in Texas. To the contrary, Appellants seek to expand the law by asserting that the law applicable to protect persons from a premises defect should be extended to their cattle. As set forth herein, Appellants' request to expand the law is unwarranted.

In Appellants' first issue, they contend that the trial court erred by submitting Question 1 to the jury because it is a question of law. The question provided as follows:

5

On the occasion in question, were [Foote's] cattle licensees on that part of Texcel Exploration, Inc.'s premises under consideration?

A "licensee" is on the premises of another with the express or implied permission of the possessor but without an express or implied invitation.

Answer "Yes" or "No."

ANSWER:   No

The remaining questions in the trial court's charge were conditionally submitted based upon an affirmative finding to Question 1. Thus, the jury only answered Question 1.

Appellants objected to the submission of Question 1 on the basis that the facts were undisputed and that they proved that the cattle had the status as invitees as a matter of law "since the cattle were present for the mutual benefit of the lessee, Mackey Yates, and of the landowner, James Styles." Appellants are making the same contention on appeal. They are asserting that because Foote was in business with the farmer-lessee and the landowner, his status[2] is extended to his cattle for the entire premises, including the area where Texcel was conducting oil and gas operations. Appellants further contend that there was undisputed evidence at trial that the oil and saltwater spilled outside of Texcel's fenced area and onto the Yates wheat pasture.

Appellants base their first issue on the contention that the evidence established as a matter of law that the cattle had the status of invitees as a matter of law. However, as a matter of law, the evidence established the opposite—that the

---

[2]Appellants essentially contend that Foote would have had the status of an invitee on the area of Texcel's oil and gas operations. Because of our disposition of this case, we express no opinion concerning Foote's status with respect to the area of Texcel's oil and gas operations.

cattle did not have the status of invitees on the area where oil and gas operations were occurring.

"We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review." *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) (quoting *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000)); *Crystal River Oil & Gas, LLC v. Patton*, 510 S.W.3d 226, 229 (Tex. App.—Eastland 2016, no pet.). An appellate court will not reverse a judgment for a charge error unless that error was harmful because it probably caused the rendition of an improper judgment or probably prevented the petitioner from properly presenting the case to the appellate courts. *Thota*, 366 S.W.3d at 687; *Crystal River Oil & Gas, LLC*, 510 S.W.3d at 229; *see* TEX. R. APP. P. 44.1(a).

"A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). A trial court also commits error if it submits a question of law to the jury. *Knutson v. Ripson*, 354 S.W.2d 575, 576 (Tex. 1962). However, absent a showing of harm that probably caused an improper judgment, such an error is generally harmless. TEX. R. APP. P. 44.1(a)(1); *Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 704–705 (Tex. App.—Houston [1st Dist.] 2007, no pet.). For example, the erroneous submission of a question of law to the jury is harmless if the jury answered the question as the trial court should have answered it—because the error did not result in an improper judgment. *Linden*, 222 S.W.3d at 705. Such errors may be deemed immaterial. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). To determine whether an alleged error is harmful, we consider the pleadings, the evidence presented at trial, and the charge in its entirety. *Crystal River Oil & Gas, LLC*, 510 S.W.3d at 229 (citing *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986)).

7

This case was pleaded and argued below on a premises liability theory. In a premises liability action, the duty that an owner or occupier of land owes to *a person* injured on the property depends on the injured person's status. *Catholic Diocese of El Paso v. Porter*, 622 S.W.3d 824, 829 (Tex. 2021). There are three possible statuses for a plaintiff in a premises liability action: invitee, licensee, or trespasser. *Id.*; *State v. Shumake*, 199 S.W.3d 279, 285 (Tex. 2006).

Appellants contend that the injured cattle were invitees as a matter of law. However, they do not cite, and our review did not find, any case that categorizes livestock or chattel as persons in the context of a premises liability action. The Texas Supreme Court has determined that, in the absence of a lease provision to the contrary, the only duty owed by the operator of an oil and gas lease to the owner or lessee of the surface that is pasturing cattle is not to injure the cattle intentionally, wilfully, or wantonly. *Warren Petroleum Corp. v. Martin*, 271 S.W.2d 410, 413 (Tex. 1954); *Santana Oil Co.*, 855 S.W.2d at 889–90 (citing *Warren Petroleum Corp.*, 271 S.W.2d at 413). Thus, the governing rule "likens wandering cattle and other domestic animals to trespassers upon the legitimate area of operations of the oil driller or producer." *See Gen. Crude Oil Co. v. Aiken*, 344 S.W.2d 668, 671 (Tex. 1961) (discussing *Warren Petroleum Corp. v. Martin*). A trespasser is "one who enter[s] upon property of another without any legal right or invitation, express or implied." *Shumake*, 199 S.W.3d at 285. The duty owed to a trespasser is to refrain from injuring him through willful, wanton, or grossly negligent conduct. *Id.*

Because cattle are trespassers under the general rule, negligence of an oil and gas operator is only actionable if a plaintiff can show the alleged negligent act was intentional, willful, or wanton. *Gen. Crude Oil Co.*, 344 S.W.2d at 671; *Warren Petroleum Corp.*, 271 S.W.2d at 413 ("The only duty owed [by the oil company to the cattle owner] was not to intentionally, wilfully or wantonly injure his cattle."). Appellants seek to escape the effect of the general rule by asserting that the cattle

were invitees or that Texcel's act of erecting a fence altered the general rule to increase the duty owed to the cattle.

Appellants' argument fails because the law is well established that the oil and gas operator is the owner and occupier of a separate estate on the premises—the dominant estate—and that, as such, the only duty owed with respect to cattle is to not intentionally, wilfully, or wantonly injure them when they are injured on the area of the oil and gas operations. *See Warren Petroleum Corp.*, 271 S.W.2d at 413; *Santana Oil Co.*, 855 S.W.2d at 889–90.

In the alternative, Appellants have argued, for the first time on appeal, that the oil escaped the area of Texcel's lease and that the cattle "were poisoned in an area of the premises where they were indisputably invitees." This argument is unavailing. Our courts have consistently held that an operator has no duty to fence, or otherwise protect or prevent livestock from entering, the premises of the mineral lease. *Brown v. Lundell*, 344 S.W.2d 863, 865–66 (Tex. 1961) (discussing the holding in *Warren Petroleum Corp. v. Martin*). In this instance, the escape of hydrocarbons outside of the area of oil and gas operations was caused by the cattle invading the operations area and causing a leak.

An oil and gas operator possesses the right to use "both surface and subsurface, as is reasonably necessary" for the oil and gas lease. *Id.* at 865. The owner of the surface may have a cause of action when the operator, through negligence, has allowed a dangerous substance to invade the surface owner's land— exceeding his allotted "reasonable use." *Gen. Crude Oil Co.*, 344 S.W.2d at 669; *Brown*, 344 S.W.2d 866–67. A case of this type is characterized as an injury-to-land case, which is distinct from an injury-to-livestock case. *Santana Oil Co.*, 855 S.W.2d at 889 (citing *Gen. Crude Oil Co.*, 344 S.W.2d at 670–71).

Appellants rely on *General Crude Oil Co.* for the proposition that a plaintiff must show that the "deleterious substance deposited upon the ground lay outside the

legitimate area of operations before he [can] recover injuries to his animals." 344 S.W.2d at 668. Appellants contend that the evidence at trial showed that the oil and saltwater escaped the fenced area into the field; however, they do not address the fact that the cattle caused the hydrocarbon fluids to escape. Furthermore, Appellants did not plead and prove, nor was the jury asked to decide, whether Texcel's use of the surface estate was more than was "reasonably necessary" for its operation. In *Santana Oil Co.*, the El Paso Court of Appeals held that "it is necessary for the cattle owner to plead and prove that the oil operator used more land than was reasonably necessary to his operation and was negligent in some respect that proximately caused the injury." 855 S.W.2d at 890 (citing *Warren Petroleum Corp.*, 271 S.W.2d at 413; *Weaver v. Reed*, 303 S.W.2d 808, 809 (Tex. App.—Eastland 1957, no writ)); *see United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 481 (Tex. 2017) (the plaintiff bears the burden to obtain affirmative answers to jury questions as to the necessary elements of the plaintiff's cause of action); *Jang Won Cho v. Kun Sik Kim*, 572 S.W.3d 783, 798 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (same).

In the absence of pleadings or jury findings that Texcel used more of the surface to conduct its operations than was reasonably necessary, Appellants' alternative theory of recovery fails.

In summary, Appellants' first issue challenges the submission of the jury question asking if the cattle were licensees. Appellants premise this issue on their contention that they established the invitee status of the cattle as a matter of law. Because we conclude that the evidence establishes as a matter of law the opposite— that the cattle were not invitees—and because there were no pleadings or findings on Appellants' alternative theory of liability, we overrule Appellant's first issue.

*Premises Liability – Factual Sufficiency*

In their second issue, Appellants challenge the factual sufficiency of the evidence supporting the jury's answer to Question 1 wherein the jury found that the

cattle were not licensees. They contend "even if the cattle were categorized as licensees, the jury's answer of "No" to Question 1 was against the great weight and preponderance of the evidence." In this same issue, Appellants also assert that Texcel and Decker failed to use ordinary care to warn Foote about the danger of the fence.

To successfully challenge the factual sufficiency of the evidence to support an adverse finding on an issue on which it bore the burden of proof at trial, the appellant must demonstrate that the finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We must consider and weigh all of the evidence and will set aside a verdict only if it so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Francis*, 46 S.W.3d at 242; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

The jury was asked in Question 1 whether the cattle were licensees on Texcel's premises. The question also instructed the jury that "[a] 'licensee' is on the premises of another with the express or implied permission of the possessor but without an express or implied invitation." *See Catholic Diocese of El Paso*, 622 S.W.3d at 829 (citing *Tex.-La. Power Co.*, 91 S.W.2d at 306). Appellants do not specifically challenge the jury's determination that the cattle were not licensees. Instead, Appellants appear to be asserting that if the cattle were not invitees, then they must have been licensees. As set out above, cattle that invade the area of oil and gas operations, if anything, are trespassers. The jury essentially determined that the cattle were trespassers on Texcel's property by answering "No" to Question 1. There is abundant support in the evidence for this finding. For example, Cypert, the party responsible for the cattle at the time of injury, testified that he was aware that he and the cattle were not allowed into the fenced area. Thus, the jury's

11

finding that the cattle were not licensees was not against the great weight and preponderance of the evidence.

As to Appellants' contention that Appellees failed to warn Appellants about the potential danger of the fence, this matter was not the focus of Question 1. Question 1 asked the jury to determine the status of the cattle from a premises liability perspective. The jury essentially determined that the cattle were trespassers, a finding that is supported by the evidence and is consistent with the law's treatment of cattle injured when they invade the area where oil and gas operations are occurring. Moreover, a landowner has no duty to warn or protect trespassers from obvious defects or conditions. *Shumake*, 199 S.W.3d at 288. Accordingly, we overrule Appellants' second issue.

*Negligent Undertaking*

In Appellants' third issue, they assert that the trial court erred by denying their requested jury instruction and jury question on negligent undertaking. Specifically, Appellants contend that Texcel's fence was inadequately built and maintained, which resulted in harm to the cattle by allowing them to enter the operations area. Appellants assert that this contention was an alternative theory of recovery to their premises liability claim.

The threshold inquiry in any negligence case is whether a duty exists, which is a question of law to be determined by the court. *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006). "The critical inquiry concerning the duty element of a negligent-undertaking theory is whether a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist." *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013).

Appellants' negligent undertaking theory is premised on the contention that the act of placing a fence around the oil and gas operations area, as well as Appellees' act of maintaining the fence, created a duty to maintain the fence in a particular

12

manner. However, we held in *McCarty v. White* that an oil and gas operator has no duty to fence off the area of his operations to keep livestock away. 314 S.W.2d 155, 157 (Tex. App.—Eastland 1958, no writ). We further held that the fact the operator erected such a fence did not create an obligation to fence off the operations area. *Id.*; *see Young v. McGill*, 473 S.W.2d 672, 673 (Tex. App.—El Paso 1971, no writ) (citing *McCarty* for the proposition that an oil and gas operator "was under no duty to fence the separator or the described area to keep the Plaintiff's cows away, and the fact that the [operator] had fenced the pit created no such obligation"). Further, the fence itself did not harm the cattle. Thus, Appellants' negligent undertaking theory is contrary to our precedent. *See McCarty*, 314 S.W.2d at 157. Simply put, the operator's act of erecting or maintaining a fence around the area of his oil and gas operations does not increase his obligation with respect to keeping livestock out of the operations area. *Id.* Accordingly, we overrule Appellants' third issue.

*Exclusion of Decker from the Trial Court's Charge*

In Appellants' fourth issue, they contend that it was harmful error for the trial court to exclude Decker from the trial court's charge. Appellants contend that, although all acts taken by Texcel on the Hertel Lease were taken by and through Decker, Decker nonetheless took independent acts that supported the submission of a negligence question for Decker. However, Appellants did not plead, nor do they assert now, that there was evidence that Decker acted outside the scope of his employment or otherwise owed an independent duty to Appellants.

Even though an employee can be individually liable for tortious acts committed while in the scope of his employment, a plaintiff must show that the employee had, and breached, an independent duty of care—separate from the one owed by the employer. *See Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996) ("Thus, unless alter ego is established, corporate officers and agents are subject to personal liability for their actions within the employment context only when they

breach an independent duty of care."). The evidence at trial showed that Decker was on the lease as an employee, acted only in the scope of his employment, and did not undertake to perform a service for the benefit of Appellants separate and apart from his capacity as an employee or agent of Texcel. Because Appellants did not establish that Decker owed a duty—separate and apart from Texcel, the trial court did not err in excluding Decker from the charge. Accordingly, we overrule Appellants' fourth issue.

*Payment for Fence*

In Appellants' fifth issue, they assert that the trial court erred in refusing to submit a jury question regarding Texcel reimbursing Cypert for the replacement fence. Appellants also contend that Texcel stipulated to a judgment for $2,500 as payment for the fence. A stipulation is an agreement between parties that touches a pending lawsuit and is not enforceable "unless it be in writing, signed and filed with papers as part of the record, or unless it be made in open court and entered of record." TEX. R. CIV. P. 11; *Caprock Inv. Corp. v. F.D.I.C.*, 17 S.W.3d 707, 713 (Tex. App.—Eastland 2000, pet. denied). We determine the intention of the parties in a trial stipulation from the language used in the agreement in light of the surrounding circumstances. *See Sitaram v. Aetna U.S. Healthcare of N. Tex., Inc.*, 152 S.W.3d 817, 824 (Tex. App.—Texarkana 2004, no pet). The statement that Cypert contends is a stipulation is as follows:

> THE COURT: Before [Plaintiff's attorney] responds, I have a question. What is your position on the question of your client apparently intending to construct a five-wire barbed wire fence around the tank battery area and the fact that Mr. Cypert did, in fact, do that and pay for it, and therefore, your client received a benefit -- and if I can't recall the exact terms in law school, quantum meruit, or something like that --

> [DEFENSE COUNSEL]: Correct.

> THE COURT: -- that your client should reimburse Mr. Cypert?

14

[DEFENSE]: And Mr. Stapp said yesterday on the witness stand he was willing to do it because the fence is still out there and he intended to construct a fence around the equipment anyway to keep livestock out so that the livestock would not damage his equipment. Not to avoid injury to the livestock.

THE COURT: I understand that.

[DEFENSE]: So enter a judgment against us in the amount of $2,500 and we won't appeal.

THE COURT: Okay. I understand now.

Appellants' attorney did not agree to the stipulation on the record, nor did he address the stipulation in his reply argument that immediately followed the alleged stipulation.

Appellants contends that "in light of the stipulation, the trial court refused to submit the Appellants' damage question" regarding the replacement fence. However, the trial court did submit a jury question about the cost of the barbed-wire fence. Question 5 asked the jury to assess "[t]he reasonable value of the barbed wire replacement fence which Keith Cypert had installed on the [Lease]."[3] Appellants did not object to the submission of Question 5 about the value of the fence.

In light of the surrounding circumstances, it appears from the record that the trial court sought to clarify Texcel's position about the fence during the charge conference. The parties did not agree on the record to a stipulation, and the submission of a jury question on the value of the replacement fence directly contradicts Appellants' contention on appeal. Thus, the record does not clearly demonstrate by the surrounding circumstances that the parties agreed to stipulate to damages for the replacement fence. Accordingly, we overrule Appellants' fifth issue.

---

[3]The jury did not answer Question 5 because it was conditionally submitted.

15

*Jury Misconduct*

In Appellants' sixth issue, they contend that the trial court erred in denying their motion for a new trial due to their allegation of juror misconduct. We review a trial court's decision to grant or deny a new trial based on an allegation of juror misconduct for an abuse of discretion. *Primrose Operating Co. v. Jones*, 102 S.W.3d 188, 193 (Tex. App.—Amarillo 2003, pet. denied). "To warrant a new trial for jury misconduct, the movant must establish (1) that the misconduct occurred, (2) it was material, and (3) probably caused injury." *In re Whataburger Restaurants LP*, 429 S.W.3d 597, 598–99 (Tex. 2014) (quoting *Golden Eagle Archery v. Jackson*, 24 S.W.3d 362, 372 (Tex. 2000)); *see* TEX. R. CIV. P. 327.a. The complaining party has the burden to prove all three elements. *In re Whataburger Restaurants*, 429 S.W.3d at 599. "Whether misconduct occurred and caused injury is a question of fact." *Id.*

Appellants contend that Juror Wilde engaged in juror misconduct by not disclosing during voir dire that her husband had been in a "physical altercation" with Cypert. However, Appellants did not allege or prove by affidavit that Juror Wilde knew Cypert or was aware of the altercation at all. Rule 327.a requires that a motion for new trial must be supported by affidavit if it is based on jury misconduct on the ground of an erroneous or incorrect answer during voir dire examination. TEX. R. CIV. P. 327.a. Appellants alleged in their motion for new trial that obtaining an affidavit from Juror Wilde would have been difficult because of "continuing animosity." However, they do not support their motion for new trial with an affidavit from Cypert detailing the animosity between Juror Wilde's husband and Cypert or Juror Wilde's knowledge of the altercation. Furthermore, no hearing was held on the motion for new trial wherein Juror Wilde could have been called as a witness to explain her responses during voir dire. *See In re Zimmer, Inc.*, 451 S.W.3d 893, 901–02 (Tex. App.—Dallas 2014, orig. proceeding) (Noting that live testimony from

16

either a juror or a nonjuror is necessary to prove misconduct); *see also Golden Eagle*, 24 S.W.3d at 372 (stating that a juror can testify about misconduct that occurred during voir dire).

During voir dire, Appellants' counsel asked:

Now, I want to go through some of the people involved. See if you got any close connection. Now, [Cypert] lives down here. I'm assuming a lot of people here know [Cypert]. Is there anybody that because of what you know of [Cypert] or you've known [Cypert], you think you couldn't be fair, either good -- good or bad? Either way. You're for him or against him? Anyone?

Counsel asked a follow-up question to the venire panel that generally inquired, "Anyone else know [Cypert] . . . ?" In order for a false answer or nondisclosure during voir dire examination to entitle a party to a new trial, the juror must have been asked a specific and direct question. *Soliz v. Saenz*, 779 S.W.2d 929, 933 (Tex. App.—Corpus Christi–Edinburg 1989, writ denied). Catch-all questions do not meet the requirement of specificity. *Id.* (citing *Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768, 851 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.)). Despite the alleged altercation between Cypert and Juror Wilde's husband, the venire panel was not asked if they or a family member had ever had a fight or altercation with Cypert. *See Wooten v. S. Pac. Transp. Co.*, 928 S.W.2d 76, 79–80 (Tex. App.—Houston [14th Dist.] 1995, no writ); *McCormick v. Tex. Commerce Bank Nat'l Ass'n*, 751 S.W.2d 887, 892 (Tex. App.—Houston [14th Dist.] 1988, writ denied).

However, even if we were to decide that Juror Wilde's failure to disclose the altercation was misconduct, Appellants have failed to discharge their burden to show that they probably suffered injury. *See In re Whataburger Restaurants*, 429 S.W.3d at 599 n.1 ("Since we find no evidence that [Juror's] nondisclosure resulted in probabl[e] injury, however, we need not decide whether the nondisclosure was material."); *Redinger v. Living, Inc.*, 689 S.W.2d 415, 419 (Tex. 1985) ("There is

no probable injury when 'the evidence is such that . . . the jury would in all probability have rendered the same verdict that was rendered[.]'") (quoting *Fountain v. Ferguson*, 441 S.W.2d 506, 508–09 (Tex. 1969)).  Here, because we have already determined as a matter of law that the cattle were not licensees, but trespassers, Appellants cannot show that they probably suffered injury.

Additionally, the jury's verdict was unanimous.  There is no evidence that Juror Wilde's alleged misconduct affected the outcome because even if another juror had been selected in her place and voted the other way, the jury's verdict would still be eleven to one.  *See Hunter v. Ford Motor Co.*, 305 S.W.3d 202, 212–13 (Tex. App.—Waco 2009, no pet.) (citing *Redinger*, 689 S.W.2d at 419; *Sharpless v. Sim*, 209 S.W.3d 825, 828 (Tex. App.—Dallas 2006, pet. denied); *Williams v. Viswanathan*, 64 S.W.3d 624, 637 (Tex. App.—Amarillo 2001, no pet.)).  Based on the record before us, we cannot say that the trial court erred in denying Appellants' motion for new trial by operation of law.  Accordingly, we overrule Appellants' sixth issue.

## *This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY
CHIEF JUSTICE


January 20, 2022

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.